[No. 28714. Department Two. May 28, 1943.]

JERRY SOVA, *Respondent*, v. FIRST NATIONAL BANK OF FERNDALE *et al.*, *Appellants.*[1]

'Reported in 138 P. (2d) 181.

*Walter B. Whitcomb,* for appellants First National Bank of Ferndale, Percy Hood, and Grace Hood.

*Sather, Livesey & Kingsbury,* for appellants Carl E. Yeager and Lillian I. Yeager.

*Fred W. Neal* and *Henderson & McBee,* for respondent.

BEALS, J.—Jerry Sova was, during the year 1939, a resident of Whatcom county, owning two tracts of land, one known as Nugent's bridge farm, about fifteen miles northeast of the city of Bellingham, the other referred to as the Bell creek farm, located five miles farther from the city. Mr. Sova was a bachelor, seventy-six years of age, and resided with one Furness, his man of all work, upon the Bell creek farm, upon which was considerable farm equipment and some livestock, all of which he owned.

Mr. Sova was a man of limited education, his schooling not having extended beyond the fourth or fifth grade. His eyesight had failed to such an extent that it was hard for him to read anything other than large print, and he had great difficulty in reading ordinary handwriting. His character and mental condition will be discussed later in this opinion.

The Nugent bridge farm was subject to a Federal land bank mortgage of $2,025. His other indebtedness, if any, was inconsiderable.

Mr. Sova had lived in Whatcom county over sixty years. During the greater portion of this period he had been engaged in farming, either for himself or in the employ of others. A tenant was occupying the Nugent bridge farm, paying $350 a year rental.

First National Bank of Ferndale was engaged in the banking business in the vicinity. Percy Hood was president of the bank, and Carl E. Yeager was engaged in business as a real estate operator in Bellingham, as was John Connell. The men had been acquainted for several years.

Not far from Sova's properties was a farm owned by Messrs. Hayton and Moen, of Mount Vernon, who had purchased the property in 1938 for $5,000. (This property will hereinafter be referred to as the Tarte place.) Yeager and Connell had an option giving them the right to purchase this property for $6,500. Yeager requested the bank to advance him money to buy the property, but the bank refused, as Yeager had already borrowed to the limit of his credit. There was, however, discussion of the matter between Yeager and Hood, representing the bank.

During the spring of 1939, Yeager spoke to Sova, asking him if he would consider a trade for either or both of his farms. Sova was responsive, and Yeager showed him several properties, in at least one of which Sova became interested. During the early part of May, Sova, his employee Furness, and Yeager again looked at this property, and on their return passed the Tarte place, a one hundred sixty acre farm, of which approximately thirty acres were timber land, and the balance improved.

The result of the negotiations between the parties was that Sova, by separate deeds, conveyed his two farms to the bank, together with a bill of sale to all of

his farm personal property, including the stock. Hayton and Moen had delivered to an abstract company a deed to the Tarte property, no grantee being named therein, Sova's name being later written in as grantee. Sova also signed a note, payable to Carl Shepherd (Yeager's son-in-law), in the sum of $6,500, together with a mortgage on the Tarte farm securing the note, which note and mortgage, upon the day they were executed, were by Shepherd assigned to the bank.

March 23, 1940, Sova instituted this action against First National Bank of Ferndale, Percy Hood and Grace Hood, his wife, Carl E. and Lillian I. Yeager, and John and Irene Connell, alleging that, as the result of a conspiracy entered into by the defendants named, he had been misled and defrauded, and deprived of real and personal property of the value of $14,000, receiving therefor nothing save the Tarte farm, subject to a mortgage for $6,500, the amount of the mortgage being at least equal to the value of the farm. Plaintiff prayed for judgment against the defendants in the sum of $14,000.

April 1, 1941, plaintiff filed an amended complaint, alleging rather larger values in connection with the property which he had exchanged for the Tarte farm, and asking for judgment against defendants for over $20,000.

The defendant bank and defendants Hood answered jointly, denying the material allegations of plaintiff's complaint. These defendants also pleaded an affirmative defense, alleging the execution of the note by Shepherd in favor of the bank, and that the mortgage from plaintiff to Shepherd was pledged to the bank to secure the same, and also alleging the execution of the bill of sale of the personal property to the bank, and that none of the answering defendants had any personal dealings with plaintiff, and took the note, mortgage, and bill of sale without knowledge of any

infirmity therein. To this affirmative defense, plaintiff replied, denying the same.

Defendants Yeager answered, also denying the material allegations of the complaint, as did defendants Connell.

The issues having been completed, the action was tried to a jury, which returned a verdict in favor of the plaintiff and against the defendants First National Bank of Ferndale, Percy and Grace Hood, and Carl E. and Lillian I. Yeager, in the sum of $16,812.50. At the close of plaintiff's case, the court sustained defendants Connells' motion for a nonsuit, and later instructed the jury to return a verdict in their favor. After the denial of motions by the defendants against whom the verdict ran, for judgment in their favor notwithstanding the verdict, or in the alternative for a new trial, judgment was entered upon the verdict in plaintiff's favor, from which defendant bank and defendants Hood have appealed, and defendants Yeager have prosecuted a separate appeal.

In this opinion, First National Bank of Ferndale will be referred to as appellant bank; appellant Percy Hood will be referred to as Hood; and appellant Carl E. Yeager, as Yeager.

Appellants bank and Hood make forty assignments of error, eleven upon the admission of testimony offered by respondent over their objection, four upon instructions given by the court to which exceptions were taken, thirteen upon refusing to give instructions requested by appellants, the others being stated as follows: Upon the denial of appellants' motion for a mistrial at the close of respondent's case; upon the denial of their motion for a nonsuit; upon the denial of various motions to withdraw from consideration by the jury certain questions concerning misrepresentations which respondent claimed were made to him; upon the rejection by the court of a deed offered as an

exhibit; upon the denial of their motion for an instructed verdict in their favor; and upon the denial of their motion to instruct the jury that in no event could a verdict be returned against those appellants for any sum greater than $6,500 and interest. Finally, appellants assign error upon the denial of their motion for judgment in their favor notwithstanding the verdict; upon the denial of their motion for a new trial; and upon the entry of judgment against them.

Appellants Yeager made thirty-four assignments of error, which in the main follow the assignments of error above referred to.

During the month of June, 1942, respondent, Jerry Sova, died, and his will having been probated and a motion to substitute his executor as party plaintiff herein having been made, such substitution has been ordered, and Clifford K. McMillin, as executor of the estate of Jerry Sova, deceased, has been substituted as party plaintiff and respondent herein. For convenience, we shall in this opinion refer to Mr. Sova as respondent.

As above stated, this is an action for damages sustained, as claimed by respondent, as the result of a conspiracy to deprive him of his property in an exchange of real estate. Respondent testified that the Bell creek farm was worth $12,000. Witnesses whom he had called valued the place at from $10,000 to $15,000. Appellants' witnesses valued the property at from $4,000 to $6,500.

Respondent valued the Nugent bridge farm at $9,000; his witnesses valued it up to $12,500; while appellants' witnesses valued it at from $3,300 to $4,600.

Respondent valued the personal property which he transferred to the bank at $3,000. A witness who was well acquainted with the property valued it at two hundred dollars less. No definite testimony as to the value of this property was introduced by appellants. After receiving title thereto, the bank sold the greater

portion of the property at auction, but the amount which the bank received is not definitely disclosed by the record.

As the net result of the transaction, respondent received the Tarte farm, subject to the mortgage which he executed as part of the transaction in the amount of $6,500. Assuming that respondent was entitled to a verdict, the evidence would support such a verdict in a considerable amount.

The trial court allowed the parties to introduce evidence covering a wide field, the statement of facts comprising over seven hundred pages.

It is difficult to imagine why one in respondent's position, exercising ordinary business judgment, could have desired to exchange his farm properties which were free from encumbrance, save the $2,000 mortgage, which were apparently affording him a comfortable home in his old age, for other farm properties where he would have to commence work anew. This is particularly true when it is remembered that respondent gave up all his personal property, leaving himself nothing with which to commence farming operations on the land which he acquired. It is impossible to read the testimony without being convinced that respondent was simple-minded, if not actually senile, as a physician who examined him at the time of trial stated he was, and that he was easily influenced. The physician above referred to testified that in his opinion respondent's mental condition, which the witness classed as senile, had existed for several years.

Appellant Yeager testified that, after respondent had agreed to trade one of his farms for an eighty-acre tract, and an escrow agreement executed and deposited with the Bellingham Abstract Company, while Yeager, respondent, and Furness were returning in Yeager's car from an examination of the eighty-acre tract, they passed the Tarte farm, whereupon Furness remarked that it was a good farm, and that he had worked on it

some thirty years previously. They then made a cursory examination of the property, whereupon respondent asked what trade he could make for it. Yeager then, or a short time thereafter, informed respondent that for the Tarte farm respondent would have to give his two farms, all his stock and farm equipment, and assume a mortgage of $6,500. Respondent registering interest in the suggested deal, Yeager spoke to appellant Hood concerning the same, but no definite arrangements were then made.

At this time, Yeager and Connell simply held an option to purchase the Tarte farm for $6,500, and apparently they did not possess the money to make the purchase. Later, Yeager again discussed the matter with Hood, informing him that all of respondent's property could be procured in an exchange. A second escrow agreement was executed and left with the abstract company, and the first escrow abandoned. After an inspection of respondent's properties, Hood agreed to advance the money necessary to purchase the Tarte farm. Hood then knew all the details of the trade, and also knew that Yeager and Connell were buying the property for $6,500. As Yeager's indebtedness to appellant bank then exceeded the limit placed on such advances by Federal law, it was agreed that Yeager's son-in-law, Shepherd, should apply to the bank for the loan. It clearly appears that Shepherd had no interest whatever in the transaction, and was merely a figurehead. Shepherd had no financial rating whatsoever, he is referred to as a laborer, and evidently it was never contemplated that he would repay the loan. Appellant Hood then wrote a letter instructing the escrow holder, the abstract company, as to the manner in which the transaction should be closed. Appellant Hood produced his office copy of this letter, which was introduced in evidence without objection, and reads as follows:

"We hand you herewith draft in the amount of $6,871.75. We are to receive a deed to the following described property; free and clear of incumbrances; a 90 acre tract now owned by Jerry Sova in Sections Twenty-one and Twenty-two, Township 39 North Range Five East W. M. Whatcom County, Washington, and a deed to the Southwest Quarter of the Northwest Quarter of Section 27 except the Northerly Ten acres deeded to Frank Arones; also Government Lots Six and Seven Section 28 lying South and East of County Roads numbers 243 and 252 all in Township 39 North Range 4 East W. M., excepting therefrom a tract of land conveyed to H. A. Cassils and wife located in the Southwest Quarter of the Northwest Quarter of Section 27 said Township and Range by deed recorded in Volume 232 of Deeds Page 465 records of Whatcom County, Washington; subject to Federal Land Bank mortgage in the sum of $2,035.00 and interest and a mortgage executed by Jerry Sova to Carl Shepherd in the principal sum of $6,500 covering the North Half of the Southwest Quarter and the Southwest Quarter of the Southwest Quarter of Section 28 and the Northwest Quarter of the Northwest Quarter of Section 33 Township 40 North Range 1 East W. M. Said note and mortgage in the amount of $6,500.00 are to be endorsed and assigned respectively by the said Carl Shepherd to The First National Bank of Ferndale; the assignment to be recorded and a combination Title Policy issued to Jerry Sova and the bank covering the deed and mortgage. We are also to receive note of Carl Shepherd in the amount of $6,871.75 and attached signed collateral agreement. Title policies are to be issued to the properties deeded to the bank by Jerry Sova in the amounts of $6,000 and $4,500 respectively. The note to be executed by Jerry Sova would be payable in the amount of $200.00 June 1, 1940, $200.00 June 1, 1941, $300.00 June 1, 1942, $350.00 June 1, 1943, and $5,450.00 June 1, 1944 with interest at the rate of 5% per annum from date and payable semi-annually.

"We are also to secure bill of sale to personal property including cows, young cattle, horses and implements which bill of sale you have in your file. The funds are to be distributed as follows:

"$6,250.00 to the Seattle First National Bank at Mt. Vernon in payment for the property mortgaged by

Sova less $52.50 for title insurance, and less $136.32 for taxes, $550.00 Jerry Sova and $124.25 title insurance charges, filing fees and revenue stamps.

"The taxes on all of the properties are to be paid in full. The fire insurance policy covering the un-incumbered tract conveyed by Sova is to be assigned to the bank and delivered to us. The policy covering the tract mortgaged to the Federal Land Bank is to be assigned and the assignment delivered to us together with the assignment of stock from the Federal Land Bank of Spokane. The policy covering the 160 acres mortgaged by Sova should be assigned and delivered. In case the present owner does not assign the insurance, we are to be notified so that we can prepare the insurance and blanks for the application of Sova before the required insurance is attached."

Appellant bank actually advanced $6,871.75, the excess over the amount required to take up the option being used to cover incidental expenses. Messrs. Moen and Hayton did not receive the full amount of $6,500, they having agreed with Yeager and Connell to pay the costs of necessary revenue stamps, the premium on a policy of title insurance for $6,500, unpaid taxes, and half a year's rental. Shepherd then signed a note for $6,871.75, in favor of the bank. Respondent executed a note and mortgage to Shepherd for $6,500, which Shepherd immediately assigned to the bank. Respondent executed deeds to his properties, conveying the same to the bank; and a policy of title insurance on the Tarte farm was issued by the abstract company in the amount of $16,000, insuring respondent and the bank. Messrs. Moen and Hayton paid for revenue stamps required on a conveyance for a consideration of $6,500, and an insurance premium for a policy of that amount only. The additional revenue stamps required for a consideration of $16,000 were placed on the deed at the abstract office at Yeager's direction, and paid for out of the money advanced by the bank. The additional premium due upon the title insurance policy for the amount thereof in excess of $6,500 was also paid out of the money advanced by the bank.

Respondent testified that his examination of the Tarte farm was cursory only; that Yeager praised the farm highly, telling him that it was the best farm in the county, if not in the state. Respondent also testified that he was not told that he must mortgage the property as part of the consideration for the deal, and that he did not know that he had mortgaged the property until six months or so after the deal was consummated, when he went to the bank to apply for a loan with which to buy equipment for the farm. He stated that he was then informed that he owed an installment on the mortgage, together with interest.

Respondent also testified that, when he signed the papers at the abstract office, the nature of the documents was not explained to him, and that he was merely told to sign his name several times, which he did.

Furness corroborated respondent's testimony as to the representations made by Yeager concerning the Tarte farm, stating that he heard Yeager tell respondent that the farm was worth $23,000, and could be sold for $25,000. Yeager denied having made any such statements, testifying that he made no representations as to value. He admitted that he had told respondent that the farm had sold for over $20,000, and that, if history should repeat itself, it would again sell for that amount. He further testified definitely that he told respondent that in making the trade the respondent would have to assume a mortgage of $6,500. He also testified that an officer of the abstract company read each instrument to respondent prior to respondent's signing the same, and explained the nature of the documents to respondent. This testimony was substantiated by Mr. Demeree, of the abstract company.

In support of his contention that appellants had conspired to deprive him of his property, to their advantage, respondent offered testimony tending to prove that Yeager, Connell, and Hood agreed among them-

selves that each should receive one-third of the profits of the deal, the share allocated to Hood to inure to the benefit of the bank. When called as an adverse witness by respondent, Yeager testified that, even before April 26, 1939, the date he received the option on the property, he and Hood had discussed the matter of the division of any profits which might accrue from the acquisition and sale of the Tarte farm, it being then agreed that Yeager, Connell, and Hood would divide any·profit equally. Yeager later sought to modify his testimony, but the jury heard both his testimony as first given and any subsequent explanation, and were entitled to draw their own conclusions.

Hood testified that he and Yeager had entered into an agreement whereby the bank was to receive one-third of the profits on the transaction, he testifying however that this agreement was made about May 24, 1939, when the bank agreed to advance the money, and wrote the letter above quoted to the abstract company. Hood also testified that he then anticipated that the profit on the deal would amount to $4,000 or $5,000, while he admitted that the profit which actually accrued amounted to over $6,000.

No contention was made that Shepherd would have any interest in the properties after the loan was paid. Shepherd was paid ten dollars out of the bank's funds for whatever services he rendered in connection with the matter. Apparently Shepherd never met either Hood or respondent until the day of trial.

The Bell creek farm was sold, the bank receiving five hundred dollars cash, a purchase money mortgage in the sum of $2,750, and two tracts of real estate. Later, the mortgage was paid to the bank, Hood testifying that the proceeds of the sale of the personal property sold at auction and the cash proceeds from the sale of real estate was applied toward the retirement of the Shepherd note. On the trial, it appeared that $971.09 in cash, the proceeds of some of respondent's

property, was not credited on the Shepherd note, but was deposited in the bank in what Hood referred to as "sales and commission account." It appears that one hundred dollars was paid from this account to appellant Yeager's attorneys, to apply on account of their fees for representing him at the trial of this action. The sum of $87.45 was paid out of the account to cover some expense incurred by Yeager in the course of the litigation. Appellant Hood had drawn six hundred dollars from the account, and while he denied that it represented any profit to him accruing from the deal with respondent, the jury might have been of the opinion that his explanation of the matter was not clear.

Appellants bank and Hood contend that their relation to the transaction was simply that of lender; that the loan bore five per cent interest, which was below the customary rate; that the loan was to be repaid in small installments; and that the bank would be required to look after the collection of the collateral security, which would require considerable time and attention. While admitting that Hood and Yeager had agreed that the bank would receive one-third of the profits, if any, they contend that the bank was not to share in any possible loss, and that, in any event, the bank was to be repaid its entire investment, with interest. These appellants also call attention to the fact that prior to the deal they had no interest in any of the properties, and that Yeager was not their agent. Neither was respondent a customer of the bank, and Hood's acquaintance with respondent was very slight. Neither Hood nor any officer of the bank made any representation whatsoever to respondent, who admitted that his dealings were all with Yeager.

These appellants also argue that there is no direct evidence of any conspiracy to which the bank or Hood was a party. Attention is also called to the fact that this action is one at law for deceit, and is not an equi-

table action for rescission; that respondent affirmed the transaction, including the mortgage which he made, and claimed damages, not rescission.

Each of the two groups of appellants here moved for a nonsuit at the close of respondent's case, and, after the jury returned its verdict, each group moved for judgment in its favor notwithstanding the verdict, all of these motions having been denied.

A discussion of the evidence contained in the statement of facts might be continued at great length. We have above called attention to certain portions thereof. From the evidence the jury might well have concluded that, at the time of the transaction which is the basis of this action, respondent was a simple-minded, trusting old man, of little education, and, if not senile, at least of failing mentality and in such a condition that he was easy to influence, and a person who could be easily imposed upon by those disposed to take advantage of him. Evidence was introduced which, if believed by the jury, as evidently it was, justified the jury's verdict against appellants Hood and the bank. The record contains evidence which supports the verdict, and the trial court did not err in denying either the motions for a nonsuit or the motions for judgment in appellants' favor notwithstanding the verdict.

Both groups of appellants make identical assignments of error from 1 to 10, both inclusive. The first four are based upon the testimony of three lay witnesses, admitted over objection, concerning respondent's mental condition. One of the witnesses, Kenoyer, was a farmer who had known respondent for fifty years. Another, W. J. Kelley, became acquainted with respondent in 1937, when the latter was living on one of his farms. After respondent made the deal here in question, he occupied a house on Kelley's farm for a few months, during which time Kelley saw respondent practically every day. Witness W. L. Kelley lived on

W. J. Kelley's farm after respondent moved there, and talked to respondent from one to three times each day. Appellants argue that these witnesses, none of whom was an expert, were by the trial court, over appellants' objection, permitted to testify as experts. We find no merit in any of these assignments of error.

■ Appellants next contend (assignments of error 5 and 6) that the trial court erred in permitting Dr. A. M. Dawson to testify as to respondent's mental condition in November, 1941, just prior to the trial, and, from an examination made by the witness at that time, to testify as to respondent's mental condition as of May, 1939, the date of the transaction between respondent and appellants. The witness testified that respondent was senile, and that his mentality was that of a child; that his physical condition was very poor; and that his mental condition had existed for some years. The testimony was competent, and we find no error in its admission.

Appellants' next assignment of error is based upon testimony of Dr. Dawson, admitted over objection, in which the doctor was permitted to state that in his opinion respondent's mental condition was such during the month of May, 1939, that he was in no condition to understand and interpret contracts. The witness stated that he had known respondent, off and on, for ten or fifteen years, and that he had examined him just prior to the trial, as above stated. The witness also testified that he had been instructed to examine respondent thoroughly, to enable the witness to testify as to respondent's present condition and respondent's probable mental condition in May, 1939. Appellants argue that Dr. Dawson was permitted to testify as a non-expert concerning respondent's ability to understand a contract, and that the doctor was not qualified, from acquaintance with respondent and for other reasons, to give such testimony. In such a trial as this, the trial court exercises a rather wide discretion in ruling upon

the admissibility of such testimony as that of Dr. Dawson. We find no merit in appellants' assignment of error.

■ Respondent called three witnesses, each of whom testified as to the value of one or both of respondent's farms.

Appellants bank and Hood assign error upon the admission of this evidence, upon the denial of their motion for a mistrial at the close of respondent's case, and also upon the giving by the court of instruction No. 15, as follows:

"You are instructed that if you should be convinced from evidence which is clear and convincing, that the consideration paid or given by the plaintiff to the defendants in the exchange of the properties, was so grossly inadequate as to shock the conscience and common sense of all men, this fact, if proven to you by evidence which is clear and convincing, is a circumstance from which the existence of fraud may properly be inferred."

These assignments of error are argued together. Appellants contend, this action being one for deceit and not for rescission, and appellants having admitted the exchange of properties, the sole question to be tried is the difference between the value which respondent received, the Tarte farm as it was, and the value which it would have had if it had been as represented. Appellants argue that it was competent only for respondent to show that he had given something of value for the property which he received, and that the admission, over their objection, of evidence concerning the value of the properties which respondent had conveyed, as consideration for the deed which he received to the Tarte farm, was improperly admitted, and was prejudicial.

This court has several times referred to the principle relied upon by appellant. In the case of *Jones v. Elliott*, 111 Wash. 138, 189 Pac. 1007, plaintiff sued to recover damages, claiming that she had been defrauded

in an exchange of real estate. She was allowed to introduce evidence concerning the value of the property which she had conveyed to defendants on the exchange. On defendants' appeal from an adverse judgment based upon the verdict of a jury, error was assigned upon an instruction of the court in which the plaintiff's contention as to the value of the property which she had conveyed was stated. This court held that no error had been committed, stating that since the action was one for damages there could be no recovery, unless plaintiff proved to the satisfaction of the jury that she had given value for the alleged worthless property which she received, and that

" . . . it was competent, if not necessary, to show the value of the property the respondent parted with in the exchange, and hence proper to submit to the jury the question whether the property given in exchange had value."

The judgment was affirmed.

In the case of *Edwards v. Powell*, 121 Wash. 598, 210 Pac. 7, 212 Pac. 163, the plaintiffs sought to recover damages based upon a similar contention. They had traded a drug store in Omaha for land in this state. A number of witnesses called by plaintiffs testified as to the value of the drug store. The defendant then offered evidence, apparently in an attempt to show that the drug store was of less value than as contended by plaintiffs, which evidence was rejected. The jury rendered a verdict in favor of plaintiffs, and on appeal error was assigned upon the rejection of the testimony referred to. It was held that the trial court had not committed reversible error in this ruling. In the course of the opinion, the court said:

"Even if this evidence had been admissible, a question which we do not now decide, its rejection was not error, since the purpose of showing the value of the drug store was only to show, as stated in *Jones v. Elliott, supra,* that the respondents had parted with something of value."

In the case at bar, appellants were permitted to introduce evidence concerning their contentions as to the values of the respective properties which respondent had conveyed to the bank.

In the case of *Ryckman v. Johnson,* 177 Wash. 498, 32 P. (2d) 116, plaintiff sued for damages, basing her claim upon alleged false and fraudulent representations made by the defendants to induce an exchange and purchase of real estate. From a judgment in favor of plaintiff, defendants appealed. Error was assigned upon the refusal of the trial court to admit testimony as to conversations relative to the value of plaintiff's property. This court, citing *Edwards v. Powell, supra,* held that the value of the property was immaterial, except to show that the plaintiff had parted with some value, and that the exclusion of the offered evidence was not error.

All of the cases cited were jury cases. In the *Jones* case, this court held no error had been committed by the trial court in admitting evidence of the value of the property which the plaintiff had conveyed. In the *Edwards* case, this court held that, notwithstanding the fact that plaintiffs had introduced evidence concerning the value of the property which they had conveyed, no error had been committed by the trial court in rejecting evidence offered by the defendant, doubtless to prove that the property was of less value than plaintiffs' evidence had indicated. The court expressed no opinion upon the question of whether or not this evidence was admissible, but held that its rejection did not constitute reversible error. In the *Ryckman* case, the defendants sought to introduce evidence concerning conversations relative to the value of plaintiff's property, "in view of evidence that the prices were based upon trading values on both sides," and the rejection of such evidence was held not to constitute error.

The decisions of this court above cited do not require a holding that, in the case at bar, the trial court com-

mitted error in permitting respondent to introduce testimony concerning the values of the respective properties which he had conveyed to the bank. Respondent was entitled to prove that he had conveyed to the bank property of substantial value. Appellants were permitted to introduce such evidence as they offered, tending to show that the values of these properties were less than contended by respondent.

Appellants argue that, while in an equitable action for rescission, evidence of value would be admissible, this being an action at law for damages, a contrary rule should apply.

In 17 C. J. S., p. 475, § 128, the rule is laid down as follows:

"Where the inadequacy is so gross as to shock the conscience and common sense of all men, it may amount both at law and in equity to proof of fraud, oppression, and undue influence."

And in 12 Am. Jur., p. 617, § 122, appears the following text:

"Aside from the effect of the inadequacy of the consideration for an option, the rule is stated to be that where the consideration is so grossly inadequate as to shock the conscience, courts will interfere, although there has been some exercise of judgment by the parties fixing it. But an examination of the cases shows that this has scarcely ever been done, the parties being competent, unless the inadequacy was coupled with circumstances of fraud or oppression or of advantage taken of some relationship of trust or dependence. Doubtless, however, the inadequacy may be so flagrant as of itself to afford a presumption of fraud, as, for instance, if the contract is, in the language of Lord Hardwicke, such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept on the other."

This court has held that inadequacy of consideration may be shown in an action for specific performance *(Pasco Fruit Lands Co. v. Timmermann,* 88 Wash. 112, 152 Pac. 675), and in actions for rescission *(Mumford v.*

*Smith,* 89 Wash. 98, 154 Pac. 153). Other courts have applied the same rule in actions at law. *Herbert v. Lankershim,* 9 Cal. (2d) 409, 71 P. (2d) 220; *Connellee v. Magnolia Petroleum Co.,* 279 S. W. (Tex. Civ. App.) 597.

We are convinced that, in such an action as this, in which the plaintiff alleges that for property of very considerable value he received, in the transaction which is the basis for his action for damages, practically nothing, plaintiff may introduce evidence concerning the value of the property which he conveyed, as well as that which he received, as such gross inadequacy of consideration is a circumstance from which the existence of fraud may be inferred by the trier of the fact. This was the rule laid down by the trial court in the instruction of which appellants complain, and we find no error in the rulings of the trial court or in the giving of the instruction, upon which matters appellants base the assignment of error which we have discussed. This rule should not be extended, but is appropriate under the circumstances disclosed by this record.

By assignments of error 11, 15, and 16, appellants bank and Hood present questions concerning the admissibility, as to them, of conversations between respondent and Yeager concerning the Tarte farm, and the denial by the trial court of their motion for a nonsuit at the close of respondent's case. These assignments of error may be discussed together. The conversations between respondent and Yeager were not in the presence of appellant Hood or any officer of appellant bank. These appellants moved that the jury be instructed to disregard, as to them, all evidence of alleged misrepresentations made to respondent by appellant Yeager. The court denied this motion, and also denied the motion of appellants for a nonsuit.

It is not contended by respondent that appellant Hood or any officer of the bank had any negotiations with respondent concerning his property, or made any representations to respondent. Respondent does not

contend that appellants bank and Hood had any interest in the option owned by Yeager and Connell on the Tarte farm, or that appellant Hood knew anything about the negotiations between Yeager and respondent concerning properties other than the Tarte farm. Appellants bank and Hood argue, first, that they were not parties to any conspiracy, and second, that, if the record discloses any fact or circumstance from which an inference that a conspiracy existed might be drawn, such conspiracy did not come into existence until after Yeager had made to respondent the representations of which the latter complains, and after the exchange of property was agreed to by respondent and he had executed the escrow agreement of May 17th. Hood denied that he ever authorized Yeager to represent him or make any statements whatsoever to respondent. Appellants again stress the point that this is not an equitable action for rescission, and that there was no fiduciary relation between respondent and the bank or any of its officers.

These appellants then vigorously contend that evidence concerning the representations made by Yeager was inadmissible as against them; that the jury should have been so instructed; and that their motion for a nonsuit should have been granted.

In connection with these assignments of error, respondent calls attention to the following testimony of Yeager:

"Q. What agreement was made between yourself, Mr. Connell and Mr. Hood relative to what disposition, if any, would be made of the profits that were to be realized or which you hoped would be realized, from this transaction? A. Well, if there was any profits we were supposed to share in them equally. Q. When was that agreement made, Mr. Yeager? When did you and Mr. Hood talk that over? A. Why, before we even got an option on this place. Q. That is, before the date of this letter of April 26, 1939? A. Yes. Q. About how long before? A. A few days. Q. After that time was it discussed, that matter of the agreement and the divi-

sion, was that subsequently discussed between you? A. I imagine it was. Q. And about how many times would you say? A. Oh, I don't think there was talk about it over once; about once. Q. Now in the discussion relative to that agreement, who participated in that discussion? A. Mr. Hood and myself."

Concerning this matter, appellant Hood testified:

"A. The arrangement between Mr. Yeager and I was that we would advance monies and take care of these properties, look after them, and if necessary when they traded off, substitute collateral for it; that he would pay a third of what he made out of it to the bank. Q. So that the agreement between yourself and Mr. Yeager was to this effect: That whatever profits were realized out of this Sova transaction were to be paid, or that the bank was to receive one-third of those profits? A. That is right. Q. Did you understand or did you discuss with him what was to become of the other two-thirds of the profits? A. No, I didn't. Q. When was that agreement made, Mr. Hood? A. It was made at the time that we consented finally to make a loan. Q. That was part of the consideration for the making of the loan? A. Yes, sir."

As above stated, the weight of the evidence was for the jury.

■ The conspiracy need not be proved by direct and positive evidence, and a finding that conspiracy existed may be based on circumstantial evidence. *American Savings Bank & Trust Co. v. Bremerton Gas Co.*, 99 Wash. 18, 168 Pac. 775; *Karr v. Mahaffay*, 140 Wash. 236, 248 Pac. 801.

■ From the record, the jury may well have believed that prior to the date respondent agreed to make the exchange, appellants Hood and Yeager agreed to take up Yeager's option on the Tarte farm, in the expectation of disposing of it at a profit, which profit would be divided equally between the bank, Yeager, and Connell, and that, in an attempt to carry out this agreement, Yeager made false representations to respondent, and induced him to exchange his properties

for the Tarte place; that, at the direction of appellant bank, respondent conveyed his properties direct to the bank; and that the bank thereafter dealt with the properties as its own, disposing of all of them, and receiving a consideration therefor. The bank procured policies of title insurance upon the real estate conveyed to it by respondent, running to itself as owner. It also, as owner, procured policies of fire insurance. Officers of the bank negotiated the sales of some of respondent's properties. Appellant Hood paid out of bank funds a portion of the attorney's fees incurred by Yeager in the trial of this action, having placed a considerable amount of the money received from sales of respondent's property in a "sales and commission account" in appellant bank, in which account were deposited funds belonging to appellant bank.

Upon the record, the trial court did not err in making the rulings of which appellants Hood and bank complain by the assignments of error now under discussion. The following cases decided by this court are in point: *State v. Wappenstein,* 67 Wash. 502, 121 Pac. 989; *Mitchell v. Hughes,* 104 Wash. 231, 176 Pac. 26; *Eyak River Packing Co. v. Huglen,* 143 Wash. 229, 255 Pac. 123, 257 Pac. 638; *Davin v. Dowling,* 146 Wash. 137, 262 Pac. 123.

The general rule is stated in 11 Am. Jur., p. 586, § 56, as follows:

"The conspiracy having been established, the acts and declarations of one conspirator, during the continuance of the conspiracy, pursuant to, and in furtherance of, it are admissible against his co-conspirators."

By assignment of error 21, appellants bank and Hood complain of an instruction given by the court defining conspiracy. Appellants excepted to this instruction, contending that the same was too broad. Under assignment 30, these appellants argue that the trial court erred in refusing to give their requested instruction No. 24.

We find no error in the trial court's instruction above referred to, and the court did not err in refusing appellants' requested instruction.

Appellants' assignments 11, 15, 16, 21, and 30 are without merit.

■ Appellants bank and Hood moved to withdraw from consideration by the jury any question of misrepresentation as to the quality of the soil of the Tarte farm. They also requested an instruction withdrawing this matter from the jury, and excepted to the refusal of the court to give the instruction. These questions are argued under assignments of error 13 and 37. Appellants argue that there was no testimony concerning any misrepresentation as to the quality of the soil.

Respondent testified that Yeager told him that the farm was the best farm in Washington, and, again, the best farm in Whatcom county. Respondent introduced evidence tending to prove that in fact the soil was poor in quality and unproductive.

The court properly instructed the jury that mere boastful assertions or exaggerated descriptions or opinions, not stated as existing fact, do not amount to fraudulent misrepresentation, under the circumstances of this case. We find no error in the rulings of which appellants complain.

By assignment 14, complaint is made of the denial of appellants' motion to withdraw from the consideration of the jury any alleged misrepresentation as to the value of the Tarte farm. By assignment 20, appellants bank and Hood complain of the denial of their motion to withdraw from consideration by the jury any question of alleged misrepresentation as to value, and all other alleged misrepresentations, save as to the mortgage on the Tarte farm, executed by respondent, and of the refusal of the trial court to instruct the jury that in no event could a verdict be returned against appellants bank and Hood for any sum greater than $6,500, with interest from May 24, 1939. By assignment 25,

these appellants complain of the refusal of the trial court, by an instruction, to withdraw from the jury's consideration any question concerning misrepresentations as to the value of the Tarte farm.

These assignments of error all concern the question of the liability of appellants bank and Hood for any misrepresentations made by Yeager as to the value of the farm.

Most of respondent's testimony as to these representations was given by respondent himself. His witness, Furness, testified briefly concerning the matter. Respondent testified that he believed Yeager's representations. Appellants print in their brief lengthy abstracts from respondent's testimony, and argue that from his testimony it appears that respondent did not rely upon Yeager's representations.

Appellant calls attention to a portion of respondent's testimony in which, as a part of a lengthy cross-examination by appellants' counsel, respondent, by answering "no" to appellants' question, "You did believe him when he said it was worth $23,000?" indicated that he had not relied upon Yeager's representations as to the value of the Tarte farm. Again, respondent indicated that he had formed an opinion in his own mind that the farm was worth $16,000, and that had it not been subject to the mortgage which he executed for $6,500, he might not have complained of the trade. Appellants rely upon other testimony of respondent. Again, respondent stated that he believed Yeager when the latter represented that the farm was worth $23,000.

Respondent's testimony suggests to one who reads it that the witness was at times confused. The jury saw and heard respondent, and the jury and the trial court were in a far better position than are we to evaluate respondent's testimony.

It is a general rule that a plaintiff is not absolutely bound by a statement in the nature of an admis-

sion elicited by a searching cross-examination, which statement is to some extent inconsistent with the witness' testimony on direct examination, or inconsistent with other facts or circumstances. *Mathis v. Tutweiler,* 295 Fed. 661; *Frost v. Los Angeles R. Co.,* 165 Cal. 365, 132 Pac. 442; *Hill v. West End St. R. Co.,* 158 Mass. 458, 33 N. E. 582; *State ex rel. Fleckenstein Brewing Co. v. District Court,* 134 Minn. 324, 159 N. W. 755.

The rule referred to has been recognized by this court in the cases of *Delaski v. Northwestern Imp. Co.,* 70 Wash. 143, 126 Pac. 421, and *Martin v. Jansen,* 113 Wash. 290, 193 Pac. 674, 198 Pac. 393.

Examination of the record convinces us that it was the province of the jury to consider and weigh all of respondent's testimony in connection with the other evidence contained in the record, and that the trial court committed no error in the rulings complained of.

■■■ All appellants complain of the refusal of the trial court to give a requested instruction, and of instruction No. 14 given by the court, by which the trial court told the jury that mere boastful assertions or exaggerated descriptions or opinions might or might not amount to fraudulent representations. Appellants excepted to this instruction, contending that some portions thereof were not applicable to the situation disclosed by the evidence, and that the instruction permitted the jury to find that respondent relied upon representations upon which he had no right to rely. Appellants requested an instruction upon this phase of the evidence similar to one approved by this court in the case of *Biel v. Tolsma,* 94 Wash. 104, 161 Pac. 1047, in which the sale of an automobile was involved, and contend that this instruction should have been given.

Respondent argues that the instruction which the court gave was correct and, in support of this argument, cites the case of *Community State Bank v. Day,* 126 Wash. 687, 219 Pac. 43.

Under the facts in the case at bar, the court did not err in refusing the instruction requested by appellants. While the instruction given by the court, to which appellants excepted, is rather prolix, the jury could not have been confused thereby, and the instruction as given does not constitute reversible error.

 Appellants assign error upon the court's instruction No. 18, arguing that by this instruction the trial court commented upon the evidence by telling the jury that the record contained evidence which was clear and convincing that respondent had been damaged by fraudulent representations made by appellant Yeager. The instruction contains a manifest error consisting of the inclusion of the word "the" before the word "evidence."

By other instructions, the court instructed the jury that the burden rested upon respondent to establish, by clear and convincing evidence, the allegations of fraud and conspiracy to defraud, which were denied by appellants in their answers. The burden which rested upon respondent was by the instructions again and again called to the jury's attention. While the error in the instruction should have been corrected when called to the court's attention by appellants' exception to the instruction, the instruction itself is not so definitely erroneous but that the jury should have understood it in accordance with the manifest intention of the court, and, taken in consideration with the other instructions given, it cannot be held that the mere inadvertent error complained of entitles appellants to a new trial. The instruction does not constitute reversible error.

Appellants next assign several errors upon the refusal of the trial court to give instructions which they requested. Instructions which the trial court gave properly covered the issues in the case. The instructions which appellants requested, which we have not already discussed, were either properly and

adequately covered by the court's instructions, or embraced language which the court properly refused.

Appellants next assign error upon the refusal of the trial court to instruct the jury to return verdicts in favor of appellants Yeager, and in favor of appellants Hood, and in favor of appellant bank. These instructions were asked for by separate requests. These three groups of appellants also assign error upon the court's denial of their respective motions for judgment in their favor notwithstanding the verdict.

Appellants Hood and appellant bank vigorously contend that the court erred in refusing to enter judgment in their favor as matter of law. They argue that the evidence was insufficient to support the verdict returned against them, because the record contains no legally admissible evidence of sufficient weight to justify the jury's finding that they are liable to respondent because of fraud practiced by these appellants, and that the record contains no evidence that these appellants conspired with Yeager to defraud respondent, or that respondent relied upon any false or fraudulent representations made by Yeager. These appellants again contend that they had no negotiations with respondent; that they were nowise interested in the Tarte farm; and that the deal was made between Yeager and respondent before they had any knowledge concerning the same, and before Yeager arranged with appellant bank that the latter should advance the money to finance the deal.

These questions have been considered in our discussion of other assignments of error. We have called attention to evidence in the record from which the jury were justified in concluding that these appellants were liable to respondent. It was for the jury to determine from the evidence the liability or nonliability of these appellants. Yeager's testimony concerning his negotiations with appellant Hood, the latter's letter of May 8th to the abstract company, above quoted,

and other portions of the record, some of which we have heretofore noticed, convince us, as they did the trial court, that the question of these appellants' liability to respondent was for the jury to determine.

We have discussed appellants' assignments of error at considerable length, realizing the importance of the questions which have been presented on this appeal. We hold that appellants Hood and appellant bank were not entitled to judgment in their favor as matter of law.

Beyond question, the jury were entitled to determine the question of the liability of appellants Yeager to respondent.

Appellants cite many authorities in support of their arguments. To discuss these authorities in detail would extend this opinion beyond all reasonable limits. Each case of this character differs in detail from every other case. Mr. Sova, prior to the deal with appellants, owned property of very considerable value, subject only to a farm loan of $2,000; after the exchange he had nothing save a farm (which the prior owners had just sold for $6,500), subject to a mortgage for $6,500. From the evidence the jury were doubtless convinced that, at the time of the trial, respondent was in his dotage, an old man, easily influenced, sometimes displaying flashes of intelligence, and then lapsing into a state of bewilderment. It is difficult to believe that his mental condition at the time of the transaction was very different from his condition at the time of the trial. The jury heard the evidence, and they were properly instructed by the trial court. We find no reason for disturbing the verdict.

Appellants were not entitled either to peremptory instructions to return verdicts in their favor, or to orders granting judgment in their favor notwithstanding the verdict of the jury.

Finally, appellants complain of the denial of their respective motions for a new trial. While the

verdict is large, it is within the range of evidence, which the jury evidently believed. The trial court found *no occasion* to order any reduction in the amount of the verdict, and we are not inclined to question the jury's finding as to the amount of damages allowed. We have heretofore considered the matters urged in support of the arguments that the court erred in denying these motions. We find no reversible error in connection with these rulings of the trial court.

Finding no error in the record, the judgment appealed from is affirmed.

SIMPSON, C. J., BLAKE, and ROBINSON, JJ., concur.

