[No. 1680-1. Division One. December 3, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIE PEELE, *Appellant*.

*Bruce A. Butcher, Cartano, Botzer & Chapman,* and *Frank W. Birkholz,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Christopher J. Bell, Deputy,* for respondent.

CALLOW, J.—A jury found the defendant guilty of first-degree murder. An important witness for the state was one Richard Boespflug, who was involved in the homicide and who had pleaded guilty to a charge of murder in the second degree arising out of the transaction. Boespflug was awaiting sentencing at the time of the trial of the defendant.

We answer two of the issues raised on the appeal: (1) Whether a gun and holster admitted into evidence had been obtained as a result of an unlawful search and seizure and (2) whether it was error to allow the witness, Boespflug, to testify at the trial when he had declined to submit to a deposition by the defense.

The defendant Willie Peele and Richard Boespflug had been acquainted for a number of years and both knew Louis Brodek. Brodek was known as a bookmaker and lived in the Capitol Hill area of Seattle. At the time of his death, he was awaiting trial on a charge of bookmaking. Boespflug was a barber whose shop was located on Broadway also in the Capitol Hill district; and the defendant, Peele, lived not far from the barbershop.

Late in the afternoon of Saturday, December 4, 1971, the defendant and Boespflug, after spending much of the day together during which each placed a bet with Brodek on a professional football game, decided to pick up, at Boespflug's barbershop, a vacuum cleaner which was used both at the barbershop and at the apartment of Boespflug's girl

friend. Boespflug testified that at this time the two of them discussed robbing Brodek and considered it unlikely that Brodek would report such a crime in view of the charge then pending against him.

It was dark at 6 p.m. on that day when a witness heard the noise of a shot coming from in front of the barbershop and saw Brodek stagger and fall to the sidewalk beside the shop. A person was seen running away from the scene. Late that evening, a girl friend of Boespflug called the police to tell them that Boespflug was implicated in the shooting. The police interviewed her, and at 3:30 in the morning of Sunday, December 5, went to the apartment of defendant Peele's girl friend where Peele was living. The police arrested the defendant when he answered their knock on the door. Certain officers took Peele from the apartment, searched him, and placed him in a squad car. When other officers did not leave the premises, Peele's girl friend told them that she rented the apartment. She demanded that the officers leave unless they could produce a search warrant. The officers ignored her, searched the apartment and found nothing. They remained longer and again searched a dresser near which Peele's girl friend was standing, found a holster at the bottom of the lower dresser drawer and the gun, admitted into evidence, on the floor below this drawer. Ballistic tests indicated that the fatal bullet came from this gun.

At the trial, the defendant admitted that he had shot Brodek. He stated that they met in front of the barbershop, got into an argument over gambling debts and claimed that when Brodek pulled a gun from his pocket, a scuffle ensued during which Brodek was shot.

The first issue raised is whether the search of the apartment and the seizure of the gun and holster found therein were unlawful. The search was made without a search warrant or permission to search the premises following the arrest of the defendant and after he had been taken away. A motion for suppression of the evidence was made and

denied; and the gun, holster and results of the ballistic tests were admitted into evidence over objection.

The dwelling of each citizen is afforded great protection under the Fourth Amendment from unreasonable searches and seizures. The safeguarding of the privacy of residences from unlawful police intrusion is a cornerstone of an individual's freedom long recognized by the courts of this state. *Tacoma v. Houston*, 27 Wn.2d 215, 177 P.2d 886 (1947); *State v. McCollum*, 17 Wn.2d 85, 136 P.2d 165, 141 P.2d 613 (1943); *State v. Buckley*, 145 Wash. 87, 258 P. 1030 (1927); *State v. Coleman*, 2 Wn. App. 982, 471 P.2d 689 (1970).

State courts are guided by the precepts set forth in *Chimel v. California*, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969). *See State v. Sanders*, 8 Wn. App. 306, 309, 506 P.2d 892 (1973). The *Chimel* case involved the arrest of a suspect at his home under a warrant authorizing his arrest for the burglary of a coin shop. The officers were admitted to the suspect's home by his wife. They waited until he arrived home from work, whereupon he was handed the arrest warrant and was asked for permission to "look around." He objected; but the officers, nonetheless, conducted a search "on the basis of the lawful arrest." They went through the entire house, attic, garage and a small workshop for nearly an hour. The California court had held that since there was a lawful arrest the search of the home was justified without a search warrant as incident to it. The opinion in *Chimel* overturned the California ruling and quoted from *McDonald v. United States*, 335 U.S. 451, 93 L. Ed. 153, 69 S. Ct. 191 (1948), as follows on page 761:

> "We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of

criminals. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

Continuing, the opinion of the court in *Chimel* said at page 763:

In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"— construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

(Footnote omitted.)

■ When a search extends beyond the limited area in the home of the suspect from which he might obtain weapons or evidentiary items, the Fourth Amendment protection against unreasonable searches and seizures requires that a search warrant be secured from an objective magistrate who must evaluate the "probable cause" affidavits of law enforcement in the light of the necessity that citizens be free from unreasonable searches and the privacy of the individual be safe from unwarranted invasion. *Vale v.*

*Louisiana,* 399 U.S. 30, 26 L. Ed. 2d 409, 90 S. Ct. 1969 (1970) and *Shipley v. California,* 395 U.S. 818, 23 L. Ed. 2d 732, 89 S. Ct. 2053 (1969), have followed the philosophy of the *Chimel* case as has *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971).

The facts in this case do not present any exception to Fourth Amendment requirements under which a search of the entire residence can be maintained. *See Vale v. Louisiana, supra* at 35; *State v. Singleton,* 9 Wn. App. 327, 511 P.2d 1396 (1973). The prosecution in its brief states that the search is not being justified as incident to an arrest. The grounds upon which the search of the entire premises appears to be defended by the prosecution is that exigent circumstances existed, and the immediate search of the apartment was a "lesser intrusion" than detaining the occupants while a search warrant was obtained. No argument or citation is presented to support such a detention.

■ An invasion of the constitutional rights of a citizen cannot be legitimatized on the basis that a search warrant could not be obtained with ease because it was on the weekend. There cannot be a higher level of constitutional protection of the rights of a citizen during the week than on the weekend. If it is inconvenient to secure a search warrant when the courts are not in session, then inconvenience must be suffered or remedied rather than the rights of the citizen violated because law enforcement would be annoyed by being required to secure the approval of the search by the uninvolved, objective judge or magistrate.

We have previously noted the difficulty of securing the issuance of a search warrant in an early morning hour. *State v. Smith,* 9 Wn. App. 309, 511 P.2d 1390 (1973). In that case involving the special concerns of the automobile exception, the situation had become emergent when the defendants were about to depart; while in this, the emergency, if any existed, was that the evidence would be destroyed because of the arrest and that panic would be engendered in the companions of the defendant. In the *Smith* case, there was no opportunity to make the arrest after a

search warrant had been secured. There, no evidence of a specific crime existed until immediately preceding the arrest. Here, there is no question but that a specific crime had been committed. Further, not only were the police aware of the identity of the dead victim, but they were aware from reliable information that the defendant was a prime suspect. With that information before them, the officers had sufficient evidence to show probable cause for the issuance of a search warrant. Further at the time of his arrest, the defendant, Peele, was not departing the scene of the crime or fleeing from the jurisdiction but instead might be expected to hide out in the premises until the morning. The circumstances in this case permitted the securing of a search warrant prior to the arrest.

*Smith* discussed *Chimel* as limiting the scope of the search incident to a lawful arrest to the area from which the person arrested might have obtained weapons or evidentiary items. In that case, it was also observed that *State v. Canaday*, 79 Wn.2d 647, 684, 488 P.2d 1064 (1971), analyzed the *Chimel* case as based on the fact that in *Chimel* nothing existed to suggest that at the time of the arrest the defendant was then "engaged in, about to engage in, was withdrawing from the scene of, or fleeing from the commission of a felony." Such a situation does not exist in this case either. The defendant was arrested 9 hours after the commission of the felony in an apartment rented by another person and was taken into custody. Exigent circumstances did not exist except those which were brought about by making the arrest. Further, the *Canaday* case was based on the declaration that the *Chimel* rule was without retroactive effect and inapplicable at the time the search in *Canaday* was made.

The state urges that *United States v. Rubin*, 474 F.2d 262 (3d Cir. 1973) and *United States v. Pino*, 431 F.2d 1043 (2d Cir. 1970), support the search made in this case. Both cases involved narcotics. In the *Pino* case, an officer saw the narcotics through a window of an apartment and heard conversation indicating that a felony sale was taking place.

The search made in the *Pino* case was justified from what was seen and heard indicating the concurrent commission of a crime. In the *Rubin* case, activity outside of the defendant's home indicated that the narcotics inside the home were about to be destroyed. The *Rubin* holding is founded upon the emergent circumstances which existed from the threatened destruction of contraband. The factual situation and the holding of the *Rubin* case are without bearing upon the factual situation here and should not be extended beyond the limited exception described. *See United States v. Goldenstein,* 456 F.2d 1006 (8th Cir. 1972).

Complete reconciliation of the plethora of cases which have considered the reasonableness of searches is not possible. Different factors bearing upon reasonableness have been given varying weight by the courts. However, the protection of the privacy of the home has been always a concern of major consequence. A violation of the security of a dwelling must not be weighed as a "lesser intrusion" in the scales of reasonableness. The forceful invasion of one's home in the night by armed police might easily change from a historically remembered fear to omnipresent apprehension but for the restraint imposed by the law. *Wolf v. Colorado,* 338 U.S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359 (1949). The need to impose this restraint impartially regardless of the crime involved is often obscured when the result secured by an unsanctioned search proves opportune to law enforcement. Nevertheless, the frustration imposed by the law on law enforcement must be borne in the interest of each individual.

In the play *A Man For All Seasons*[1] by Robert Bolt, Sir Thomas More, the Lord Chancellor of England, is attended by his wife, his daughter and William Roper, who is courting his daughter. Richard Rich, a hanger-on who has been spying against More, enters and is introduced to the assemblage. It is soon apparent to Rich that he is suspect, and he

---

[1]From *A Man For All Seasons,* by Robert Bolt. Copyright 1960, 1962 by Robert Bolt. Reprinted by permission of Random House, Inc.

quickly departs. All present call upon More to arrest Rich, but More will not. The scene continues:

MORE And go he should, if he was the Devil himself, until he broke the law!

ROPER So now you'd give the Devil benefit of law!

MORE Yes. What would you do? Cut a great road through the law to get after the Devil?

ROPER I'd cut down every law in England to do that!

MORE . . . Oh? . . . And when the last law was down, and the Devil turned around on you—where would you hide, Roper, the laws all being flat? . . . This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then? . . . Yes, I'd give the Devil benefit of law, for my own safety's sake.

The search made was a violation of the Fourth Amendment. The motion to suppress should have been granted.

■ When evidence is admitted in violation of the federal constitution, the court must be able to declare that the erroneous admission was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *State v. Martin,* 73 Wn.2d 616, 440 P.2d 429 (1968); *State v. Melrose,* 2 Wn. App. 824, 470 P.2d 552 (1970). If a real possibility exists that the jury reached a result it might not have reached otherwise, then a retrial is indicated. *State v. Finnegan,* 6 Wn. App. 612, 495 P.2d 674 (1972). The defendant testified that the shooting was accidental and that the gun had belonged to the victim. This raised questions as to whether the homicide was murder in the first degree, murder in the second degree, manslaughter or excusable or justifiable homicide. We cannot say under these circumstances that the erroneous admission of the gun and holster did not prejudice the defendant when the jury found him guilty of murder in the first degree.

The result of the suppression of the holster and gun as

evidence has not been presented as an issue but must be considered upon retrial of the cause. The defendant took the stand, testified that the decedent had pulled a gun from his pocket and that a shot was fired in the scuffle that followed. He steadfastly denied possession or ownership of the gun which directly linked him to the crime through the ballistic comparison. The testimony of the defendant does not amount to an intentional relinquishment of the constitutional protection against an unreasonable search and seizure or overcome the presumption against such a waiver. The gun and holster must continue to be suppressed as evidence. *Brookhart v. Janis,* 384 U.S. 1, 16 L. Ed. 2d 314, 86 S. Ct. 1245 (1966); E. Fisher, *Search & Seizure* § 57 (1970).

■ When the defendant testified, he did so under oath and without any special claim or restriction of his testimony to a limited purpose. Testimony given at a prior trial may be used for purposes of impeachment and as proof of the truth for which proffered when it is an admission of a party defendant. *People v. Corbo,* 17 App. Div. 2d 351, 234 N.Y.S.2d 662 (1962); *Sova v. First Nat'l Bank,* 18 Wn.2d 88, 138 P.2d 181 (1943); Annot., 5 A.L.R.2d 1406, 1408 (1949); 5 R. Meisenholder, *Wash. Prac.* § 424 (1965).

The use of such testimony, however, is subject to the restriction of *Harrison v. United States,* 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008 (1968). In the *Harrison* case, the defendant was tried and convicted; and upon appeal, his conviction was overturned on the basis that his confessions had been illegally obtained and were, therefore, inadmissible. Upon retrial, the testimony of the defendant at the first trial was introduced by the prosecution over the objection of the defendant who argued that he only testified at the prior trial because of the wrongful introduction of the inadmissible evidence. The opinion notes that the pertinent issue before the trial court upon the retrial was whether the defendant testified at the first trial after the wrongful admission of the illegally obtained evidence only because that evidence was admitted or whether the defendant would have waived his privilege to remain silent and taken the

stand in any event. *See State v. Erho,* 77 Wn.2d 553, 561, 463 P.2d 779 (1970). *Harrison* places upon the prosecution the burden of showing that the erroneous denial of the motion to suppress did not induce the defendant to testify. In the *Harrison* case, the court observed that the defense counsel had announced in his opening statement that the defendant would not testify; while here, counsel stated that the defendant would testify. However that may be, the *Harrison* case requires resolution of this issue in the absence of the jury upon retrial.

The action of the trial court in declining to exclude the testimony of the witness Boespflug when he refused to be deposed is challenged. We find that an appropriate course was taken under the circumstances in requiring the prosecution to disclose all available, relevant material concerning the knowledge of the prospective witness about the case.

It is the prosecutor's obligation under CrR 4.7 to disclose to the defendant any written or recorded statements and the substance of any oral statements of a witness he intends to call. If a prospective witness refuses to discuss the case with either counsel, the counsel is required to make a showing of the materiality of the testimony and that it is necessary to take a deposition. CrR 4.6(a). The court, upon notice and the filing of a motion supported by such a showing, may order the testimony of the witness taken by deposition in the manner provided in civil actions. CrR 4.6(c). The court may, on a showing of cause, order that all information and material to which a party is entitled be disclosed in time to permit his counsel to make beneficial use of it. CrR 4.7(h)(4). Though the sanctions for failure to make discovery are primarily directed against a recalcitrant party and not against a prospective witness, the trial court is given the power to handle situations as they arise. CrR 4.7(h)(4), (7).

When a deponent refuses to answer the questions propounded, the court may take such course as it deems just under the circumstances. The imposition of sanctions is

within the discretion of the trial court. *State v. Music,* 79 Wn.2d 699, 489 P.2d 159 (1971); *State v. Butler,* 4 Wn. App. 303, 480 P.2d 785 (1971); Annot., 7 A.L.R.3d 8 (1966). In view of the imminence of trial and the attitude of the witness, the course taken was proper. Here the trial court granted the defendant an appropriate available alternative when the witness, through no shown fault of the prosecution, refused to discuss the case. *See* 23 Am. Jur. 2d *Depositions & Discovery* § 311 (1965).

The other point raised by the defendant on appeal is moot as a result of our decision. The judgment is reversed and the cause remanded for a new trial.

HOROWITZ and FARRIS, JJ., concur.

Petition for rehearing denied February 19, 1974.

Review denied by Supreme Court June 17, 1974.