11 P.3d 714 (2000)
142 Wash.2d 17
STATE of Washington, Appellant,
v.
Harlan M. WILLIAMS, Respondent.
No. 67963-1.
Supreme Court of Washington, En Banc.
Argued March 9, 2000.
Decided October 19, 2000.
*715 Jim Krider, Snohomish County Prosecutor, S. Aaron Fine, Deputy, Everett, for Appellant.
Washington Appellate Project, Jason Brett Saunders, Seattle, for Respondent.
Tom P. Conom, Edmonds, Amicus Curiae on Behalf of Washington Association of Criminal Defense Lawyers.
MADSEN, J.
The State appeals a trial judge's order suppressing the admission of heroin into evidence in this criminal proceeding. The suppression order relates to the legality of a police entry into a third party's home to serve an arrest warrant on the defendant. Two Everett police officers arrested Harlan Williams, pursuant to an arrest warrant, while he was a guest in a friend's home. During a search of the defendant incident to that arrest, the police officers discovered heroin in the defendant's pocket. At trial, the defense moved to suppress the heroin. The defendant asserted that under the decision of State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980), he had "automatic standing" to challenge the legality of the police officers' entry into the apartment. The defense further argued that under the bright-line rule stated in State v. Ferrier, 136 *716 Wash.2d 103, 960 P.2d 927 (1998), the police search of the apartment was invalid since the police officers failed to inform the tenant of his right to refuse consent to a police search absent a search warrant. The trial judge agreed and suppressed the heroin, which had the practical effect of terminating the case. We hold that the defendant lacked standing to contest the police entry into a third party's home. We further conclude that even if the defendant does have standing to object to the officer's entry, the police's conduct in this case did not constitute a "knock and talk" search within the meaning of the Ferrier decision.

FACTS
During the afternoon of April 27, 1998, a citizen contacted Everett police officer Jeff Katzer outside of the Snohomish County Jail and informed the officer that Harlan Williams, the defendant, had a warrant out for his arrest and that he was currently at a local residence. The citizen also provided a description of the defendant's clothing and green van. The officer confirmed that Williams had an outstanding felony arrest warrant, drove to the described residence, and identified the defendant's green van parked outside in the parking lot. Officer Katzer requested further assistance, and Officer McAllister arrived on the scene.
The two officers approached the apartment's open door and called inside for Williams. The tenant, Alan Jelinek, appeared at the doorway. Officer Katzer told Jelinek that he was looking for the defendant, whose van was in the parking lot. Jelinek said that he did not know the defendant nor the owner of the green van. Officer Katzer advised Jelinek that there was a warrant for Williams' arrest and asked for Jelinek's consent to enter into the apartment to look for the defendant. Jelinek said yes and stepped back to allow the officers to enter.
When the officers entered the apartment, they immediately spotted the defendant. The officers identified the defendant by the scars on his arms. The defendant shortly thereafter confirmed his identity. The officers placed the defendant under arrest. In a search incident to the arrest, the officers found .8 grams of a black tar substance in the defendant's pocket that field-tested positive for heroin.
Later, Officer Katzer contacted Jelinek and confirmed that the defendant was not living at Jelinek's apartment and that the defendant had just come over to help move some of Jelinek's belongings with the van. He also confirmed that Jelinek had willingly given the officers permission to enter his home on April 27.

ANALYSIS
The State challenges the trial court's reliance on Simpson to grant the defendant automatic standing to challenge the validity of the search of Alan Jelinek's apartment. The United States Supreme Court has rejected the doctrine of automatic standing in United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and the State contends that Washington has never adopted the doctrine under article I, section 7 of the Washington Constitution. This case requires revisiting the automatic standing doctrine and its applicability in this case.
Automatic standing began as a unique method to deal with a particular problem in search and seizure cases where possession is an element of an offense. In Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), overruled on other grounds by Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619, the Supreme Court perceived two distinct problems inherent in challenging police searches that produced contraband. The first problem was "that a defendant charged with a possessory offense might only be able to establish his standing to challenge a search and seizure by giving self-incriminating testimony admissible as evidence of his guilt...." Salvucci, 448 U.S. 83, 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (Syllabus). The second "dilemma" was the "`vice of prosecutorial self-contradiction' whereby the Government would assert that the defendant possessed the goods in question while simultaneously asserting that he did not possess them for the purposes of claiming the protections of the Fourth Amendment...." Id. The Court in Jones attempted to eliminate these *717 dilemmas by creating automatic standing, which allowed the defendant to challenge police searches without making self-incriminating statements, where the fruits produced evidence of a possessory offense.
The Supreme Court abandoned the automatic standing doctrine in Salvucci. The Court recognized that Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), eliminated most of the defense and prosecutorial dilemmas which had led it to adopt the doctrine. The defendant in Simmons challenged the government's right to use, at trial, his incriminating statements made during a suppression hearing. The Court held that there is an "undeniable tension" created when a defendant must decide whether to sacrifice his Fifth Amendment right against self-incrimination in order to assert his equally valid Fourth Amendment right of protection from illegal searches and seizures. Simmons, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. The Court therefore held that a defendant's testimony in a suppression hearing cannot be used as evidence to help establish guilt during the trial. The Salvucci court found that Simmons adequately protected the defendant's Fourth and Fifth Amendment interests, and abandoned Jones and its automatic standing rule. The Court reasoned that "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated ." Salvucci, 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619.
Although defunct in the federal courts, automatic standing still maintains a presence in Washington. We first adopted automatic standing in State v. Michaels, 60 Wash.2d 638, 646-47, 374 P.2d 989 (1962), where we approved of the Supreme Court's reasoning in Jones. After Salvucci, we addressed the changes to federal law and a plurality of the Court determined that the Washington Constitution's greater privacy protections required adherence to the automatic standing doctrine. State v. Simpson, 95 Wash.2d 170, 181, 622 P.2d 1199 (1980). The plurality recognized that "Simmons, as interpreted by the [Supreme] Court in Salvucci, does not provide sufficient protection against the self-incrimination dilemma. In Washington, prior statements made by a defendant are admissible at trial for purposes of impeachment." Simpson, 95 Wash.2d at 179-80, 622 P.2d 1199 (citing State v. Peele, 10 Wash. App. 58, 67, 516 P.2d 788 (1973)). The plurality concluded that "[u]nder these circumstances, we discern both a continuing policy basis and firm state constitutional grounds for adherence to the automatic standing rule. The rule is already established under our state constitution and has served our state well for 17 years...." Id. at 181, 622 P.2d 1199 (citing Michaels, 60 Wash.2d at 646-47, 374 P.2d 989). Although there may be ample support in this statement to conclude that our state constitution requires automatic standing, we agree with the State that this is not a proper case to apply automatic standing.
In Michaels, we acknowledged that application of automatic standing is proper where (1) "[the defendant] is legitimately on the premises where a search occurred" and (2) "the fruits of the search are proposed to be used against him." Id. at 646-47, 374 P.2d 989; see Jones, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697. Based on that language, the trial court here concluded that automatic standing exists whenever there is a search and a subsequent seizure of contraband. We believe, however, that this is an overly broad interpretation of the conditions for automatic standing outlined in Jones. Inherent in the conditions for automatic standing is the principle that the "fruits of the search" bear a direct relationship to the search the defendant seeks to contest.
Here, the defendant fails to meet the criteria for application of the automatic standing doctrine. The defendant stipulated that the police officers found the heroin on his person. The defendant has standing to object to an illegal search of his person. But, the defendant does not challenge the search of his person, which was a valid search incident to his arrest under a valid arrest warrant. He is challenging only the officer's entry into a third party's residence to serve the arrest warrant. The defendant's ability to challenge that entry does not depend *718 upon his admission to possession of contraband or to any other illegal activity. We cannot agree that the automatic standing rule as originally conceived by the Supreme Court would have any application where there is no conflict in the exercise of his Fourth and Fifth Amendment rights. Moreover, as expressed by the plurality opinion in Simpson, the automatic standing rule may not be used where the defendant is not faced with "the risk that statements made at the suppression hearing will later be used to incriminate him albeit under the guise of impeachment." Simpson, 95 Wash.2d at 180, 622 P.2d 1199. Automatic standing is not a vehicle to collaterally attack every police search that results in a seizure of contraband or evidence of a crime.
Additionally, the defendant's challenge to this police search would fail, even if we found that Williams had a sufficient expectation of privacy in Jelinek's apartment to confer standing.[1] The United States Supreme Court has held that an arrest warrant "authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." Steagald v. United States, 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). The Court further held in Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." The Court reasoned that
an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.[2]
Id. at 603, 100 S.Ct. 1371. Thus, even if Williams had standing in his own right, he would be unable to successfully challenge a police entry of his own home to serve an arrest warrant. We find no reason to confer additional privacy protections to suspects who are arrested in other person's homes. We agree with the Ninth Circuit's observation that "[i]f an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's fourth amendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another." United States v. Underwood, 717 F.2d 482, 484 (9th Cir.1983).
The defendant argues, however, that the Washington Constitution offers more protective privacy rights under article I, section 7 than the United States Constitution and cites to our recent decision in Ferrier.[3] In that case, we adopted the standard *719 of the New Jersey Supreme Court, which held that "`where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent.'" Ferrier, 136 Wash.2d at 116, 960 P.2d 927 (emphasis omitted) (quoting State v. Johnson, 68 N.J. 349, 346 A.2d 66, 68 (1975)). The court went further
to state the obvious-that the only sure way to give such a protection substance is to require a warning of its existence. If we were to reach any other conclusion, we would not be satisfied that a home dweller who consents to a warrantless search possessed the knowledge necessary to make an informed decision. That being the case, the State would be unable to meet its burden of proving that a knowing and voluntary waiver occurred.
Ferrier, 136 Wash.2d at 103, 960 P.2d 927. In light of that barrier, we adopted the rule that "article I, section 7 is violated whenever the authorities fail to inform home dwellers of their right to refuse consent to a warrantless search." Id. at 118, 960 P.2d 927. Thus,
when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home.
Id. The officers employed this "knock and talk" procedure in Ferrier. Four officers, equipped in black raid jackets, approached Debra Ferrier's home and asked permission to enter. Once inside, the officers observed two infant children and explained to Ferrier that they learned of a marijuana growing operation in her house and that they would like to search the house for marijuana. They then asked for consent to search the home and had her sign a consent form. Ferrier testified that she was never informed of her right to refuse a search nor advised of her Miranda rights (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), and that she consented only after the officers told her that they would take her grandchildren away to Child Protective Services. Id. at 108, 960 P.2d 927. The officers "admitted that they conducted the knock and talk in order to avoid the necessity of obtaining a search warrant authorizing a search of the home." Id. at 115, 960 P.2d 927. The court concluded that "[b]ased on these facts... we conclude that the knock and talk, as carried out here, violated Ferrier's state constitutional right to privacy in her home...." Id. The court found that this was a clear abuse of police power and then adopted the requirement that police officers inform a resident of their right to refuse consent to a police search when police use the inherently coercive "knock and talk."[4]
We recently limited Ferrier to the kind of coercive searches the police employed there. State v. Bustamante-Davila, 138 Wash.2d 964, 983 P.2d 590 (1999). We rejected the contention that Ferrier was a "bright-line" rule required in every case where police obtain search authority by consent. Rather, "[t]his Court limited its holding in Ferrier to employment of a `knock and talk' procedure." Id. at 980, 983 P.2d 590. The police officers in Bustamante-Davila accompanied a United States Immigration and Naturalization Service agent serving a deportation order on the defendant at the defendant's home. The court observed that the officers "merely accompanied the INS agent as backup, a standard practice in INS arrest and deportation matters." Id. at 980, 983 P.2d 590. At the defendant's door, the defendant consented to entry into his home, where eventually the INS agent and police officers spotted an illegally held rifle in plain view. The court found that "Petitioner did not consent to a search, but consented to entry into his home *720 by the INS agent ... Petitioner at least impliedly consented to entry by the local police officers accompanying the INS agent." Id. at 980-81, 983 P.2d 590.
We find that this situation is indistinguishable from Bustamante-Davila. In this situation, the police officers did not seek to enter Jelinek's apartment to look for contraband or to arbitrarily search a home for a hidden guest. The officers in this case first verified the accuracy of an informant's statement and identified the defendant's vehicle in front of Jelinek's apartment, which allowed the officers to reasonably conclude that Williams was inside. Subsequently, when the officers spoke with Jelinek, the officers did not request permission to search the premises but only asked whether the defendant was inside. Jelinek told the officers that there was a guest in his home and that he knew the guest by another name. He agreed to allow the police officers to come inside and confirm the identities of the persons inside. Considering the limited purpose of the police entry and that Jelinek acknowledged that he had guests inside, this case does not resemble a "knock and talk" warrantless search that Ferrier intended to prevent.
We recognize that law enforcement officers need to enter people's homes in order to provide their valuable services for the community on a daily basis. We do not find it prudent or necessary to extend Ferrier to require that police advise citizens of their right to refuse entry every time a police officer enters their home. Police officers are oftentimes invited into homes for investigative purposes, including inspection of break-ins, vandalism, and other routine responses. We do not find a constitutional requirement that a police officer read a warning each time the officer enters a home to exercise that investigative duty. To apply the Ferrier rule in these situations would unnecessarily hamper a police officer's ability to investigate complaints and assist the citizenry. Instead, we limit the requirement of a warning to situations where police seek to conduct a search for contraband or evidence of a crime without obtaining a search warrant.
We hold that the police officers' entry into Jelinek's home was valid and reverse the trial judge's order suppressing the admission of heroin. We remand for further proceedings.
GUY, C.J., TALMADGE, IRELAND, and BRIDGE, JJ., concur.
SANDERS, J. (dissenting)
This appeal presents two issues: (1) Does an apartment dweller "consent" to a warrantless search and seizure absent advice that he may decline; and, if so, (2) does a guest within the apartment have standing to object when he himself is the object of the unconstitutional search?
I would answer the first question in the negative based upon State v. Ferrier, 136 Wash.2d 103, 960 P.2d 927 (1998), which limits the warrant requirement's consent exception to a consent fully informed by an express admonition of the right to refuse; and I would answer the second question in the affirmative, recognizing the right of the guest to assert the constitutional rights of the resident pursuant to the automatic standing rule articulated in State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980).
Therefore the learned trial court's decision to suppress evidence found on the person of the defendant should be affirmed, and I dissent from the majority's contrary result.

I.

Standing
To deal with the standing question we must first recall what the majority has apparently forgotten, viz., the purpose of automatic standing is to protect all of our rights against unconstitutional search and seizure by removing the incentive, or profit, which prompts the unconstitutional act. Although in many, if not most, instances the evidence unconstitutionally seized is sought to be used against the person whose constitutional rights have been violated, there are also those situations where the fruit of the tree poisoned by the constitutional deprivation is sought to be used against a third person whose particular rights were not violated by the unconstitutional search of another. Granting the third person "automatic standing" *721 to seek suppression of the unconstitutionally seized evidence therefore provides the government an incentive to refrain from unconstitutional conduct.
The majority admits automatic standing "still maintains a presence in Washington," Majority at 717, because of the "continuing policy basis and firm state constitutional grounds for adherence to the automatic standing rule ... already established under our state constitution...." Simpson, 95 Wash.2d at 181, 622 P.2d 1199 (citing State v. Michaels, 60 Wash.2d 638, 646-47, 374 P.2d 989 (1962)).
Automatic standing allows a remedy which protects us all in the end by protecting the accused in the beginning.[1] Under this doctrine the defendant "has the right to invoke all the privacy interests that an individual properly in possession of the [property] could assert." Simpson, 95 Wash.2d at 182, 622 P.2d 1199. Denying protection to a defendant who meets the doctrine's requirements "allows the invasion of a constitutionally protected interest to be insulated from judicial scrutiny by a technical rule of `standing'. The inability to assert such an interest threatens all of Washington's citizens, since no other means of deterring illegal searches and seizures is readily available." Id. at 180, 622 P.2d 1199.
Although the majority cites the two-factor test for automatic standing enunciated in Michaels in 1962 as determinative in the present case, a more recent reformulation of the rule is set forth in Simpson:
[A] defendant has "automatic standing" to challenge a search or seizure if: (1) the offense with which he is charged involves possession as an "essential" element of the offense; and (2) the defendant was in possession of the contraband at the time of the contested search or seizure.
Simpson, 95 Wash.2d at 181, 622 P.2d 1199. The facts of the present case fit within the literal language of the Simpson rule. Williams was charged with possession of a controlled substance under RCW 69.50.401(d). Possession is not only an essential element of the offense, but it is the offense. See RCW 69.50.401(d) ("unlawful for any person to possess a controlled substance"). Without dispute Williams was in possession of the heroin at the time the search of the residence and seizure of his person took place. Thus, Williams is "entitled to the full protection of the automatic standing doctrine." Simpson, 95 Wash.2d at 182, 622 P.2d 1199.
However, the majority parses between the search for, and seizure of, Williams on the one hand and the search of his person incident to that seizure on the other. Majority at 717-718. The majority asserts the "`fruits of the search' [must] bear a direct relationship to the search the defendant seeks to contest," claiming the distinction between the search for and seizure of Williams, and the subsequent search of his person, is constitutionally meaningful; the latter somehow not "directly" the result of the warrantless entry into the apartment. Majority at 717. Of course, absent that unconstitutional entry there would be no seizure of Williams, nor search of his person. The relationship between the seizure and search for Williams and the search of Williams is therefore so "direct" the search of Williams would be impossible absent the search for Williams.
Thus the search yielding the contraband at issue was predicated upon and directly flowed from the constitutional infirmity.[2] Although the majority would immunize a search of one's person for contraband as the fruit of a different tree, Majority at 717-718, in reality the search incident to arrest was merely an extension of the same search which began at the front door. The legality of the search for contraband necessarily includes the manner by which the officers gained their opportunity to conduct that search. Addressing a similar issue the United States Supreme Court opined:

*722 We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (emphasis added) (quoting James MacArthur Maguire, Evidence of Guilt, 221 (1959)).
In Wong Sun the Court considered whether illegally obtained declarations required the exclusion of narcotics subsequently seized on the basis of those declarations. Much like the facts here the prosecutor "`wouldn't have found those drugs except that [the third party declarant] helped us to.'" Id. at 487, 83 S.Ct. 407. The Court held the narcotics were discovered by the exploitation of the original illegality and hence they could not be used against the defendant. Id. at 488, 83 S.Ct. 407.
Here the police could not have constitutionally executed the arrest warrant, much less conducted a search incident to arrest, absent consent of the homeowner. See Steagald v. United States, 451 U.S. 204, 216, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Regardless of the abstract legality of a search incident to arrest, this series of events began with a warrantless search of the apartment for the accused. Thus, "the fruits" of Williams's claim must be considered when he objects to the foundational constitutional violation which inexorably led to seizure and the search of his person. Since the purpose of the automatic standing rule is to discourage unconstitutional searches by rendering their fruits inadmissible, even against a third person, it simply makes no sense to restrict the rule because the individual searched seeks to vindicate constitutional guaranties initially applicable to others. That is precisely the reason we have an automatic standing rule in the first place.

II.

Warrantless Search Not Excused by Invalid Consent
"The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enterall his force dares not cross the threshold of the ruined tenement!"
Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 (1958) (quoting remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament in March 1763).
The "consensual" invasion of a person's home by police officers acting without benefit of search warrant is a "`jealously and carefully drawn'" exception to the warrant requirement of article I, section 7, of our state constitution. Ferrier, 136 Wash.2d at 111, 960 P.2d 927 (some sources omitted) (quoting State v. Hendrickson, 129 Wash.2d 61, 72, 917 P.2d 563 (1996)). This is especially so because, "`"[w]here the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so."'"[3]Ferrier, 136 Wash.2d at 115, 960 P.2d 927 (quoting State v. Leach, 113 Wash.2d 735, 744, 782 P.2d 1035 (1989) (quoting United States v. Impink, 728 F.2d 1228, 1231 (9th Cir.1984))).
That a homeowner must be informed of the right to decline a warrantless "knock and talk" search by police was the holding in Ferrier. There we noted "`where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element *723 of which is knowledge of the right to refuse consent.'" Ferrier, 136 Wash.2d at 116, 960 P.2d 927 (emphasis added) (quoting State v. Johnson, 68 N.J. 349, 346 A.2d 66, 68 (1975)).
We held: "further protection for individuals in their home is necessary because, unlike a search warrant, a search resulting from a knock and talk need not be supported by probable cause, or even reasonable suspicion," Ferrier, 136 Wash.2d at 118, 960 P.2d 927, and continued:
[W]hen police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a [search] warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search.... The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.
Id. at 118-19, 960 P.2d 927.
Without dispute the officers who seized Williams lacked a search warrant when they knocked at Jelinek's door. But they were constitutionally required to have one, or at least fall within an exception to the warrant requirement, to constitutionally proceed to search for their object within the apartment's interior.[4] Equally undisputed is their failure to advise Jelinek of his right to refuse the search, a precondition to valid consent as per Ferrier.
The majority doesn't expressly overrule Ferrier but might as well. The majority opines the search at issue here "does not resemble a `knock and talk' warrantless search that Ferrier intended to prevent," because of the "limited purpose of the police entry and that Jelinek acknowledged that he had guests inside." Majority at 719-720. To the contrary, the rationale of the rule discerned in Ferrier is to protect us all from warrantless search absent consent freely given with full knowledge of the right to refuse.
"Knock and talk" was described in Ferrier as a procedure:
"like any other follow-up investigation that a detective or police officer would do. You go to the door, knock on the door, make contact with the resident, ask if you can come in to talk about whatever the complaint happens to be....
"Once you're inside, you talk about why you're there and you ask for permission to search the premises."
Ferrier, 136 Wash.2d at 107, 960 P.2d 927 (quoting 1 Verbatim Report of Proceedings at 24). We found the procedure constitutionally defective because (1) Ferrier was in her home when the police initiated contact with her; (2) the officers conducted the knock and talk in order to avoid the necessity of obtaining a warrant authorizing a search of the home; and, most importantly, (3) the officers did not advise Ferrier that she had the right to refuse to consent to the search of her home. Ferrier, 136 Wash.2d at 115, 960 P.2d 927.
Here the officers followed up on a tip from an informant in the course of a normal investigation. They went to the door of Jelinek's residence and called out the defendant's name, at which time Jelinek met them at the door. After asking whether Williams was inside, an officer "asked if it was alright to enter the apartment to make sure the defendant wasn't inside."[5] Clerk's Papers (CP) at 4. The officers never advised Jelinek that he could refuse consent, limit the search, or withdraw consent at any time. Such is clearly the predicate to consent required by Ferrier, as fully recognized by the trial court, which suppressed the fruits of the unconstitutional conduct.
The majority's mischaracterization of the search for a person as constitutionally "limited" defies reason. General warrants issued in England also had a "limited" purposeseditious libel, for examplebut left the determination of places to be searched and persons to be arrested solely to the discretion *724 of the executing officials. Steagald, 451 U.S. at 220, 101 S.Ct. 1642. Likewise, writs of assistance issued in the Colonies were "limited" to any uncustomed goods but noted only the object of the search, leaving customs officials free to search any place they believed such goods might be found. Id. Such. "limited" writs were the seeds from which the American Revolution grew,[6] while the ill-considered words of our majority betray the victory so dearly won.
Now our majority invites the police to knock and talk their way across the city, searching hundreds of houses on the strength of a single arrest warrant and uninformed consent, as long as they merely ask to come in and look around "to make sure the defendant wasn't inside," never informing the homeowner that he has the right to refuse. CP at 4. The Ferrier rule, and its reason, is thus as surely defeated as would have been the case had its dissent mustered a constitutional majority. See, e.g., Lankford v. Gelston, 364 F.2d 197 (4th Cir.1966) (enjoining police procedure under which 300 homes searched pursuant to arrest warrants for two fugitives).
Furthermore, any contraband belonging to Jelinek and discovered as a result of the "consensual" search could presumably be used against him as the basis for an independent and unrelated prosecution, thus gutting the warrant mandate in that context as well. Never having been offered the option to decline the search, Jelinek is deemed to have "consented" for the police to search his home, thereby opening the door to personal criminal responsibility for anything they might have found in plain view. The search of hundreds of homes on the power of a single arrest warrant can reasonably be expected to bear much more poisoned fruit than merely the arrestee himself. But were the court consistent with today's result any challenges to the validity of those "limited" searches would meet the same demise as the rule in Ferrier apparently does today. Let the majority defend the fruits of the principle it harvests.
The majority also misreads State v. Bustamante-Davila, 138 Wash.2d 964, 983 P.2d 590 (1999), finding the present case "indistinguishable." Majority at 720. But Bustamante-Davila itself distinguished Ferrier because "[t]he police officers ... did not proceed to Petitioner's residence with the intent to find contraband without obtaining a search warrant"; the officers merely accompanied a United States Immigration and Naturalization Service (INS) agent to back up the execution of a presumptively valid deportation order. Bustamante-Davila, 138 Wash.2d at 980, 983 P.2d 590.
Even more importantly, we noted the INS needs no warrant to detain a suspected illegal alien, id. at 976, 983 P.2d 590, citing Reno v. Flores, 507 U.S. 292, 307, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993), thus INS officers, and therefore local police who accompanied them, did not proceed to the residence to effect a seizure within the scope of the Fourth Amendment, nor implicate the state constitutional guaranties which were *725 the very basis of Ferrier.[7] Moreover, unlike Bustamante, the officers here were operatives of the primary state agency, specifically requesting permission to conduct a warrantless search for, and seizure of, a person on the premises, squarely implicating the state constitutional rights recognized in Ferrier.
The majority would restrict the constitutional requirement that the homeowner be advised of his right to refuse entry to those "situations where police seek to conduct a search for contraband or evidence of a crime without obtaining a search warrant." Majority at 720. This untenable distinction wants for an arguable basis in constitutional law or theory because it rests on the object of the search, not whether the consent exception to the warrant requirement has been met. See Steagald, 451 U.S. at 214 n. 7, 101 S.Ct. 1642 ("[T]he plain wording of the Fourth Amendment admits of no exemption from the warrant requirement when the search of a home is for a person rather than for a thing.").
Inconsistently, under the majority's analysis, the Ferrier rule would apply if police, acting on a tip and without a warrant, had arrived at the door and asked Jelinek "if it was alright to enter the apartment to make sure" there weren't drugs or other contraband inside. Yet the majority decides not to "unnecessarily hamper a police officer's ability to investigate complaints and assist the citizenry," Majority at 720, in situations where "the search of a home is for a person rather than for a thing," Steagald, 451 U.S. at 214 n. 7, 101 S.Ct. 1642. However in both cases the home is entered by state agents without a warrant; whereas in the former case the majority would hold valid consent requires advisement of the right to say no, in the latter situation no such advice is now constitutionally required. The distinction is without rational basis: whether the search is for a thing or a person, it is still an invasion of hallowed ground without authority of law,[8] not excused by consent.
The claim that advising homeowners of the option not to consent creates hardship for officers "invited into homes for investigative purposes, including inspection of break-ins, vandalism, and other routine responses," Majority at 720, assumes a search initiated at the homeowner's request is equivalent to one initiated by the police. In the former, however, invitation, not consent, is the issue. Because the request for police assistance is initiated by the homeowner, advisement of the homeowner's right to decline admittance to the police he has summoned would be a most curious result.
We addressed legitimate concerns attendant to a police-initiated search in Ferrier, where we wrote "we do not believe that requiring police officers to inform residents of their right to refuse consent to the search will seriously impede the ability of the police to use the knock and talk as an investigative tool, considering that there are many cases where a suspect consented to the search after being informed of the right to refuse consent." Ferrier, 136 Wash.2d at 117, 960 P.2d 927. The United States Supreme Court, discussing the even greater imposition of actually obtaining a warrant, put it somewhat more bluntly:
[T]he inconvenience incurred by the police is simply not that significant. First, if the police know of the location of the felon when they obtain an arrest warrant, the additional burden of obtaining a search warrant at the same time is miniscule. The inconvenience of obtaining such a warrant does not increase significantly when an outstanding arrest warrant already exists.... Finally, if a magistrate is not *726 nearby, a telephonic search warrant can usually be obtained.
Steagald, 451 U.S. at 222, 101 S.Ct. 1642.
The majority protests we would extend greater rights to Williams or a guest than to the homeowner if he himself were the object of the arrest warrant. Majority at 718. This is true. The distinction is well recognized in Supreme Court precedent that a suspect may be arrested in his own home with an arrest warrant although one's home may only be involuntarily searched for a third person with a search warrant. Steagald, 451 U.S. at 213, 101 S.Ct. 1642. That the majority apparently disagrees with this Supreme Court distinction is no license to disregard it. We must yield to higher authority that we be ruled by laws, not men.
Moreover, by comparing the current case to one in which authorities enter Williams's own home on the power of a warrant to arrest him, the majority misses the point of Steagald. Regardless of the protections an individual would, or wouldn't, have in his own home to oppose the execution of an arrest warrant, any search based on defective consent is as deficient as its necessity to first obtain a search warrant.
Williams's claim stands not for the proposition that an individual can or should achieve extra rights in the house of another, but merely that governmental agents must abide by the constitution if their investigations are to yield evidence admissible in a court of law. As in Steagald, the power granted by the arrest warrant is immaterial when its exercise is based on the violation of a homeowner's constitutional right to be free from warrantless invasion to search for the person of another.
These officers arrived at Jelinek's apartment without a search warrant notwithstanding their sole objective was to seize and search Williams. By so doing the officers ignored the search warrant requirement of article I, section 7, then flaunted the "jealously and carefully drawn" exception to that requirement by failing to even attempt to acquire the informed consent required by Ferrier. The majority thus dispenses with the requirement that "the waiver of the right to require production of a warrant must, in the final analysis, be the product of an informed decision." Ferrier, 136 Wash.2d at 118, 960 P.2d 927.
What is "limited" by the majority is the homeowner's protection against warrantless invasion of the home by agents of the government absent informed consent. To protect us all, Williams must have standing to protect himself.
SMITH, JOHNSON and ALEXANDER, JJ., concur.
NOTES
[1] We stated in State v. Carter, 127 Wash.2d 836, 841, 904 P.2d 290 (1995), that "[a] defendant who lacks automatic standing may still possess a legitimate expectation of privacy in the place searched or the thing seized, and on that basis be able to challenge the search or seizure." See United States v. Salvucci, 448 U.S. 83, 86-87, 100 S.Ct. 2547, 2549-50, 65 L.Ed.2d 619 (1980). Considering that Jelinek's apartment door was open when officers arrived and that the defendant stipulated he was a "casual visitor," it proves difficult to reasonably conclude that the defendant had a "legitimate expectation of privacy" in Jelinek's apartment.
[2] In Steagald v. United States, the Court distinguished between the protections of the arrest and search warrants. "An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." 451 U.S. at 213, 101 S.Ct. 1642.
[3] Section I, article 7 of the Washington Constitution declares: "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[4] A police officer testified that a "knock and talk" is "like "any other follow-up investigation that a detective or police officer would do. You go to the door, knock on the door, make contact with the resident, ask if you can come in to talk about whatever the complaint happens to be...." Once you're inside, you talk about why you're there and you ask for permission to search the premises." Ferrier, 136 Wash.2d at 107, 960 P.2d 927.
[1] "[T]he exclusionary rule exists to deter future police misconduct systemically. The deterrent purpose extends to law enforcement as a whole, not merely to `the arresting officer.'" Arizona v. Evans, 514 U.S. 1, 21, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (Stevens, J., dissenting) (citations omitted).
[2] See "knock and talk" discussion, infra at 8-10.
[3] Officer Katzer was approached by the citizen informant at 4:24 p.m. on a Monday afternoon as he left the Snohomish County Jailone block away from the courthouse where presumably Katzer had "ample opportunity" to obtain a warrant to search for Williams. Instead, Katzer proceeded to Jelinek's apartment, knocked on his door, and asked for permission to search the premises without a warrant to do so, intending to conduct a warrantless search based on Jelinek's consent.
[4] "[T]he plain wording of the Fourth Amendment admits of no exemption from the warrant requirement when the search of a home is for a person rather than for a thing." Steagald, 451 U.S. at 214 n. 7, 101 S.Ct. 1642.
[5] This is directly contrary to the majority's assertion "the officers did not request permission to search the premises but only asked whether the defendant was inside." Majority at 720.
[6] Writing for the Court in Stanford v. Texas, 379 U.S. 476, 481-82, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), Justice Stewart explained the words of the Fourth Amendment:

They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever "be secure in their persons, houses, papers, and effects" from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book," because they placed "the liberty of every man in the hands of every petty officer." The historic occasion of that denunciation, in 1761 at Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. `Then and there,' said John Adams, `then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'"
(quoting Boyd v. United States, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886)).
[7] In State v. Gwinner, 59 Wash.App. 119, 796 P.2d 728 (1990), the Court of Appeals held evidence independently and lawfully obtained by federal officers acting pursuant to federal law was admissible in state criminal proceedings, even though evidence obtained in a similar manner by state officers might have violated defendant's state privacy rights. See also State v. Brown, 132 Wash.2d 529, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998).
[8] "The warrant requirement is especially important under article I, section 7, of the Washington Constitution as it is the warrant which provides the `authority of law' referenced therein." State v. Ladson, 138 Wash.2d 343, 350, 979 P.2d 833 (1999) (citing City of Seattle v. Mesiani, 110 Wash.2d 454, 755 P.2d 775 (1988)).