# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68828-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER JON MOORE, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: September 16, 2013 |
| | ) | |

Cox, J. — Warrantless searches and seizures are per se unreasonable because they violate the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution.[1] But "'there are a few jealously and carefully drawn exceptions to the warrant requirement.'"[2] The State bears the burden of proving an exception applies.[3]

Here, the State relies on the emergency aid exception to support the validity of a warrantless search of locked rooms in Christopher Moore's home. During that search, police officers discovered illegal drugs that served as the

---

[1] State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

[2] State v. Schultz, 170 Wn.2d 746, 753-54, 248 P.3d 484 (2011) (quoting State v. Reichenbach, 153 Wn.2d 126, 131, 101 P.3d 80 (2004)).

[3] Id. at 754.

basis for his arrest, prosecution, and conviction. Because this record fails to show that the emergency aid exception applies to this case, we reverse.

The unchallenged findings of fact from the CrR 3.6 hearing provide context.

On December 9, 2010, police officers were dispatched to an address in Marysville in response to a 911 call reporting "a physical domestic." This report of a physical "domestic disturbance" identified Christopher Moore and S.B. as the persons involved. The 911 caller indicated he had received a call from "the victim, [S.B.]," but she "had been disconnected." The caller also explained that he was "unable to reach [S.B.] further."

Upon arrival at the Marysville residence, two police officers spoke with Moore, who identified himself immediately when he answered the door. They asked "if they could come inside and talk." "[Moore] responded 'Sure.'"

Once inside, one of the two officers spoke with Moore "while [the other officer] began a protective sweep of the residence." The officers noted that Moore "appeared calm, as did two children who were seated in an adjacent family room watching TV." The officers also noted that "nothing appeared out of the ordinary inside the residence."

While speaking with Moore, the officer who remained with him near the residence's entrance learned additional information from dispatch. The 911 caller told dispatch that he "had received the call from [S.B.] that evening with [S.B.] crying and stating that 'Chris' had 'beat the s**** out of [her]." The 911 caller further reported that "he heard some yelling and a disturbance and the line

2

went dead; he was unable to get [S.B.] back on the phone." As the officer near the entrance spoke with Moore, he "confirmed that his girlfriend was [S.B.] and they had an argument that evening but that she'd left some time earlier."

During the "protective sweep," the other officer found one marijuana plant in the bathroom and discovered three locked doors, which Moore declined to open when asked to do so. An officer kicked in two of the three locked doors, searching for S.B. Moore then provided a key to the third door. They did not find S.B. Rather, they discovered marijuana plants and a marijuana grow operation in the previously locked room. They arrested Moore and secured a search warrant. When executing the warrant, they discovered more than 100 marijuana plants and equipment associated with a grow operation.

The State charged Moore with manufacture of a controlled substance. After a bench trial on stipulated evidence, the court found Moore guilty as charged.

Moore appeals.

## EMERGENCY AID EXCEPTION

Moore argues that the police violated article 1, section 7 of the state constitution by invading his home and searching a locked room without authority of law.[4] We agree.

---

[4] Appellant's Opening Brief at 8.

"As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution."[5]

Despite the protections against warrantless searches "'there are a few jealously and carefully drawn exceptions to the warrant requirement.'"[6] The State bears the burden of proving an exception applies.[7]

The emergency aid exception is one of these exceptions.[8] "This exception emerges from the police's 'community caretaking function' and 'allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance.'"[9] Such an invasion is permitted only if the State can show that:

> "(1) the police officer subjectively believed that someone likely needed assistance for health or safety concerns; (2) a reasonable person in the same situation would similarly believe that there was need for assistance; . . . (3) there was a reasonable basis to associate the need for assistance with the place being searched." . . . (4) there is an imminent threat of substantial injury to persons or property; (5) state agents must believe a specific person or persons or property is in need of immediate help for health or safety reasons; and (6) the claimed emergency is not a mere pretext for an evidentiary search.[10]

---

[5] Garvin, 166 Wn.2d at 249.

[6] Schultz, 170 Wn.2d at 753-54 (quoting Reichenbach, 153 Wn.2d at 131).

[7] Id. at 754.

[8] Id.

[9] Id. (quoting State v. Thompson, 151 Wn.2d 793, 802, 92 P.3d 228 (2004)).

[10] Id. (quoting Thompson, 151 Wn.2d at 802) (citing State v. Kinzy, 141 Wn.2d 373, 386-87, 5 P.3d 668 (2000); State v. Leffler, 142 Wn. App. 175, 181,

4

"[T]he failure to meet any factor is fatal to the lawfulness of the State's exercise of authority."[11]

For purposes of a suppression hearing, the question is whether the findings of fact support the conclusions of law.[12] Unchallenged findings of fact are verities on appeal.[13] We review de novo the trial court's conclusions of law.[14]

The supreme court recently addressed the emergency aid exception in the context of a reported incident of domestic violence in State v. Schultz.[15] Here, the trial court that heard Moore's case cited Schultz in support of its decision.

In Schultz, Sequim police officers received a report "from a resident of an apartment complex" about a loud argument between a male and female.[16] When the officers arrived at the apartment, they heard a man and a woman yelling and "specifically overheard the man say that he wanted to be left alone and needed his space."[17] When the officers knocked on the door, the woman, Patricia Sue

---

183, 178 P.3d 1042 (2007); State v. Ladson, 138 Wn.2d 343, 349, 979 P.2d 833 (1999)).

[11] Id. at 760 n.5.

[12] State v. Hill, 123 Wn.2d 641, 645-47, 870 P.2d 313 (1994).

[13] State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003).

[14] Schultz, 170 Wn.2d at 753.

[15] 170 Wn.2d 746, 248 P.3d 484 (2011).

[16] Id. at 750.

[17] Id. at 750-51.

Schultz, answered and denied that anyone else was in the apartment.[18] The officers then told Schultz they heard a male voice.[19] She called for Sam Robertson, later identified as the male whose voice the police had previously heard.[20] He emerged from a nearby bedroom.[21] Schultz then stepped back and the officers followed her inside.[22]

After entering the apartment, the officers separated Schultz and Robertson.[23] One officer spoke to Schultz inside the apartment and noticed that her "neck was red and blotchy."[24] Both Schultz and Robertson independently told the officers that there had been no physical violence during their argument.[25]

While talking to one of the officers, Schultz began "acting 'fidgety' and picking things up around the house."[26] As Schultz was picking things up, the officer "noticed a handgun and a marijuana pipe on the table."[27] He then asked

---

[18] Id. at 751.

[19] Id.

[20] Id.

[21] Id.

[22] Id.

[23] Id.

[24] Id.

[25] Id. at 752.

[26] Id.

[27] Id.

Schultz if he could search the house for narcotics.[28] She consented but later revoked her consent.[29] The officers then obtained a search warrant by telephone, and, after conducting a search, discovered methamphetamine.[30] Schultz was charged with methamphetamine possession.[31]

In Schultz, the supreme court adopted six factors that the government must show to justify a warrantless intrusion under the emergency aid exception.[32] The court also recognized the unique challenges for law enforcement in domestic violence situations, where the emergency aid exception may arise.[33] As the court observed:

> Domestic violence situations can be volatile and quickly escalate into significant injury. Domestic violence often, if not usually, occurs within the privacy of a home. Our legislature has recognized that the risk of repeated and escalating acts of violence is greater in the domestic context. The legislature has sought to provide [the] "maximum protection" to victims of domestic violence through a policy of early intervention.[34]

With the above and other points in mind, the court continued, stating that a survey of cases indicates that:

---

[28] Id.

[29] Id.

[30] Id.

[31] Id.

[32] Id. at 754-55.

[33] Id. at 755.

[34] Id. (citing RCW 10.99.040(2)(a); RCW 10.99.010).

the fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the subjective belief of the officer that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent threat of injury.[35]

Buttressing this latter point, the supreme court recognized that "the likelihood that a situation involves domestic violence is an important consideration in evaluating the reasonableness of an officer's subjective belief that someone needs safety assistance."[36]

The supreme court held that the State was required to show that all of the emergency aid exception elements were established before the police crossed the threshold of her apartment.[37] It then examined the facts most favorable to the State to decide whether the requirements were met.[38]

Here, we do the same, starting with the unchallenged findings of fact. They are verities on appeal.

For purposes of our analysis, we consider whether in this case the written findings support the Schultz factors. In doing so, we note that the absence of any one factor is fatal to the State's burden to establish that the emergency aid exception applies in this case.

_____

[35] Id. at 756.

[36] Id. at 759.

[37] Id. at 750-60.

[38] Id. at 760.

8

*Police Officers' Subjective Belief of Needed Assistance*

Moore conceded below,[39] as he ultimately does on appeal,[40] that the State showed that the police subjectively believed that an individual needed assistance at Moore's residence. That concession is proper.

At the time the responding officers stood at the threshold of Moore's home, they had received a 911 call of a "physical domestic" disturbance at a specific Marysville address. The 911 caller indicated that he had received a call "from the victim, [S.B.], that the call had been disconnected, and he had been unable to reach her further." The other name provided by the 911 caller was Christopher Moore. When the officers arrived at the address that the 911 caller provided, they spoke with Moore, who immediately identified himself when he answered the door. They asked "if they could come inside and talk." "[Moore] responded 'Sure.'"

The trial court made further unchallenged findings that these officers had extensive domestic violence training and responded to domestic violence calls on a daily basis. The officers testified to their obligation to identify whether a domestic violence victim is present at a location and is safe. They also stated that they felt they needed to verify for themselves if S.B. was present inside the house and safe.

---

[39] Report of Proceedings at 34.

[40] Appellant's Reply Brief at 4.

This information was sufficient to establish these officers' subjective belief that someone likely needed assistance for health and safety concerns. This satisfies the first Schultz factor.

*Reasonable Belief of Needed Assistance*

Moore contests the existence of the second Schultz criterion. His argument is not persuasive.

This criterion requires that the officers' belief of the need for assistance is reasonable. The unchallenged findings that we discussed in connection with the first factor also serve to fulfill the second.

Moore contends the evidence was insufficient to support this criterion. In doing so, he purports to summarize what the evidence showed when the police were at the threshold of Moore's house as follows:

> (1) an anonymous (unverified as to veracity) report of a physical domestic violence incident; (2) the officers heard no raised voices outside the house; (3) Mr. Moore answered the door and showed no signs of distress; (4) everything in the home appeared to be in order and there were children watching television who appeared in good spirits; (5) Mr. Moore answered all questions consistently with what officers observed; and (6) there was no history of domestic violence of any kind associated with Mr. Moore individually or Mr. Moore and [S.B.] together. That is it.[41]

If Moore suggests by the first item of this summary that verification of either the identity of the 911 caller or the reliability of the information he provided is required to establish this exception to the warrant requirement, he is mistaken. In Schultz, there was no identification of the caller who reported the disturbance

---

[41] Appellant's Opening Brief at 15.

to the police.[42] The opinion only states that the call came "from a resident of an apartment complex."[43] And the opinion does not discuss reliability of either the informant or the information provided as a requirement for this exception to the general requirement for a warrant.[44]

This case is no different from Schultz. Such situations as those here and in Schultz are distinct from ones where authorities must establish reliability of the informant and the information provided to obtain a warrant.[45]

Likewise, the failure of the police to hear raised voices from within Moore's home is not, by itself, dispositive to refute the officers' reasonable belief that someone likely needed assistance for health and safety concerns. As for Moore's allegedly calm demeanor, the officers only noted that after gaining admittance to the house. It cannot be a factor for purposes of showing what the officers knew when they were at the threshold, prior to entry. Stated otherwise, there is substantial evidence to support the unchallenged findings that support this conclusion.

---

[42] Schultz, 170 Wn.2d at 760.

[43] Id.

[44] See id.

[45] See State v. Lyons, 174 Wn.2d 354, 359, 275 P.3d 314 (2012) (noting that an affidavit in support of a warrant "may be based on an unidentified informant's tip, [but] the affidavit must contain some of the underlying circumstances that led to the informant to believe that evidence could be found at the specified location. In particular, the affidavit must set forth the underlying circumstances specifically enough that the magistrate can independently judge the validity of both the affiant's and informant's conclusions.") (citing Aguilar v. Texas, 378 U.S. 108,114, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 413, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)).

Moore's remaining three points do not concern what the officers knew when they stood at the threshold, prior to entering the home. Thus, they neither support nor refute the showing required at the threshold of the home.

Under the circumstances detailed in the unchallenged findings, the officers had a reasonable belief that there was a need for assistance. This satisfies the second Schultz factor.

*Reasonable Basis to Associate Needed Assistance With Place Searched*

While Moore appears to challenge this showing, it is unclear what that challenge is. In any event, the findings support the existence of this factor.

As we have already discussed, the information provided to police indicated that S.B., the reported "victim," was involved in a "physical domestic" disturbance at a specific address. Christopher Moore's name was provided by the caller. Moore verified his identity when police asked when he answered the door on their arrival.

This shows that there was a reasonable basis to associate a need for assistance with Moore's house. This satisfies the third Schultz factor.

*Imminent Threat of Substantial Injury to Person*

Moore argues that the police officers had insufficient information about S.B.'s situation when they were at the threshold of his home to satisfy this factor. We agree.

Conclusion of Law 4 is at issue. That conclusion states:

The information that the Officers received was that there was a domestic violence hang up call and the victim was no longer responding to attempts to get her on the phone. Further information was that the victim was crying, the reporting party heard

a disturbance and yelling and the line went dead. The Court finds that there was a very real potential that the victim could have been subject to imminent harm and that the officers had a professional responsibility to rule out such a threat.[46]

The focus of our inquiry is to determine what the officers knew when they were at the *threshold* of Moore's residence. We have already detailed what they knew then, according to the trial court's findings of fact. They knew of a "physical domestic" disturbance at a specific address. They also knew that the 911 caller identified Christopher Moore and S.B. as the persons involved. The caller further indicated that he had received a call from "the victim, [S.B.]," and she "had been disconnected and the [911] caller was unable to reach her further." Upon the officers' arrival at the reported address, Moore identified himself when he came to the door.

Significantly, this record lacks any information that there was any "imminent threat of substantial bodily injury" to S.B. when the police stood at the threshold, as the fourth Schultz factor requires. The second sentence of the above quotation, that "the victim was crying, the reporting party heard a disturbance and yelling and the line went dead," describes knowledge the officers acquired *after* they entered Moore's residence.

After entry into the house, the officer who remained with Moore near the entrance learned additional information from dispatch. Specifically, he learned that the 911 caller "had received the call from [S.B.] that evening with [S.B.] crying and stating that 'Chris' had 'beat the s**** out of [her]." The caller further

---

[46] Clerk's Papers at 17.

13

reported that "he heard some yelling and a disturbance and the line went dead; he was unable to get S.B. back on the phone." And the officer also learned from Moore that "his girlfriend was [S.B.] and they had an argument that evening but that she'd left some time earlier." This additional information, received *after* police gained Moore's consent to enter his home to talk, goes beyond what they knew of S.B.'s condition *before* they entered the premises.

Thus, the second sentence of the trial court's Conclusion of Law 4, quoted above, merges what the officers knew about S.B.'s condition before and after entering the home. In short, it does not support a determination of an *imminent threat* of *substantial injury* to S.B. prior to entering the home to justify the warrantless search of the locked room that followed.

In reaching our conclusion, we stress that Moore gave the two officers consent to "come inside to talk" to him. There is nothing to indicate that the scope of his consent extended to the search that followed. Yet, once inside, one of the two officers immediately began a "protective sweep of the residence." This led to discovery of the locked doors, two of which the police kicked in to determine whether S.B. was there.

The State submitted a statement of additional authorities, citing State v. Dancer[47] to support the officers' actions. That case is distinguishable. There, Division Two of this court held that where police officers "obtain consent to enter *and search a home for a person* after informing the home's occupant of the

_____

[47] 174 Wn. App. 666, 300 P.3d 475 (2013).

purpose of the search[,]" the search is lawful.[48] Here, however, the police did not obtain Moore's consent to search his home for S.B. Thus, Dancer is not helpful.

*Police Officers' Belief of Immediate Need of Help by Specific Person*

We do not address this factor because it unnecessary to do so. Our determination that the State failed in its burden to show the fourth Schultz criterion makes discussion of this fifth factor unnecessary.[49]

*No Pretext for Evidentiary Search*

We address this sixth Schultz factor because Moore raises, for the first time on appeal, the argument that police were required to inform him of his right to refuse their entry when they asked whether they could come inside to talk. He argues that the absence of such warnings is an independent basis to invalidate the search that followed the officers' entry into his home. We disagree.

The protection against warrantless searches may be waived by meaningful, informed consent.[50] But as the supreme court held in State v. Ferrier,[51] when police officers knock on the door of a person's home in order to

---

[48] Id. at 674-75.

[49] See Schultz, 170 Wn.2d at 760 n.5 (noting that analysis of all factors is unnecessary because the failure of any one factor is fatal to the lawfulness of the State's exercise of authority without a warrant).

[50] State v. Ferrier, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

[51] 136 Wn.2d 103, 960 P.2d 927 (1998).

15

obtain consent to conduct a warrantless search, "they must, prior to entry, inform the person of the right to refuse or revoke consent."[52]

The supreme court has limited the application of Ferrier and the consequent use of what courts now call Ferrier warnings.[53] It has noted that "there is a fundamental difference between requesting consent to search a home and requesting consent to enter a home for other legitimate investigatory purposes."[54] The constitutional protections against warrantless searches are not present "when the police seek consensual entry to question a resident."[55] Thus, "when police officers seek entry to question a resident, the home is merely incidental to the purpose" and no warnings are required.[56]

In State v. Khounvichai,[57] the supreme court held that Ferrier warnings were not required where officers sought entry into a residence for the legitimate

---

[52] Schultz, 170 Wn.2d at 758-59 (citing Ferrier, 136 Wn.2d at 118); State v. Khounvichai, 149 Wn.2d 557, 563, 69 P.3d 862 (2003)) ("[T]he Ferrier requirement is limited to situations where police request entry into a home for the purpose of obtaining consent to conduct a warrantless search and have declined to broaden the rule to apply outside the context of a request to search.").

[53] See Khounvichai, 149 Wn.2d at 563; see also State v. Williams, 142 Wn.2d 17, 28, 11 P.3d 714 (2000) (noting that Ferrier warnings are not required where police request consent to enter a home to arrest a visitor pursuant to a valid arrest warrant).

[54] Khounvichai, 149 Wn.2d at 564.

[55] Id.

[56] Id.

[57] 149 Wn.2d 557, 69 P.3d 862 (2003).

investigatory purpose of questioning an occupant about an alleged offense.[58] There, two officers were responding to a malicious mischief report, and knocked on the door of the address provided by the complainant.[59] When a woman answered, they asked her whether the suspect was at home.[60] She told the officers that the suspect was her grandson and was at home.[61] The officers then asked if they could enter to talk to him.[62] She then replied "'oh, yes' and waved the two officers inside."[63] The Khounvichai court held, "we do not find it prudent or necessary to require that police officers warn citizens of the right to refuse consent to search when they request entry into a home merely to question or gain information from an occupant."[64]

Here, as in Khounvichai, when the officers were at the threshold and knocked on the door, Moore answered. The officers confirmed his identity. They then asked if "they could come inside to talk." Moore responded "Sure." This agreement to entry contrasts with what the supreme court characterized as acquiescence in Schultz, where "neither officer requested permission to enter"

---

[58] Id. at 565-66.

[59] Id. at 559.

[60] Id.

[61] Id.

[62] Id.

[63] Id.

[64] Id. at 566.

the home and yet entered anyway.[65] Thus, unlike in Schultz, the officers' entry was not accomplished through Moore's mere acquiescence.[66] Rather, as in Khounvichai, he gave his express consent for the police to enter "to talk."

As for pretext to search that concerned the Ferrier court, there was none here. The core of the trial court's determination that there was no pretext for an evidentiary search is found in its unchallenged statement that there was "absolutely no hint of pretext in the Officers' search of [Moore's] home." This determination underscores that Ferrier warnings were not required on entry.[67]

The State argues that the officers' search of Moore's home was consensual and not an infringement of his privacy rights. This is incorrect. The record shows that, once the officers gained entry to talk, they obtained additional information from Moore and police dispatch. The State implicitly argues that this additional information justified the kicking in of the doors to the locked room that followed. We disagree.

Here, it is undisputed that the scope of Moore's consent to the officers' entry was for the officers to talk to him. There was no consent then to search either the premises or the locked room.

Nevertheless, immediately upon entering the home, one of the two officers began what the trial court characterized as a "protective sweep" of the home while the other officer continued speaking with Moore near the entry.

---

[65] Schultz, 170 Wn.2d at 756.

[66] See id.

[67] Ferrier, 136 Wn.2d at 118-19; Khounvichai, 149 Wn.2d at 562-63.

"While making a lawful arrest, officers may conduct a reasonable 'protective sweep' of the premises for security purposes."[68] Such a protective sweep is not a search in the conventional sense but rather an extension of a Terry[69] investigatory frisk or pat down.[70] A protective sweep is limited to "a cursory visual inspection of places where a person may be hiding."[71] When the protective sweep extends beyond the immediate area adjoining the place of arrest, the police must have "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably and prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'"[72]

Here, this protective sweep was not done incident to any arrest. Rather, the purpose stated by the trial court was to search for S.B. Nor has the State provided any authority to justify this sweep as supporting the kicking in of the two locked doors that led to the discovery of the illegal grow operation.

More importantly, there is nothing in the findings or conclusions of the court to explain whether the police received the additional information regarding

---

[68] State v. Hopkins, 113 Wn. App. 954, 959, 55 P.3d 691 (2002) (citing Maryland v. Buie, 494 U.S. 325, 334-35, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)).

[69] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d. 889 (1968).

[70] See Buie, 494 U.S. at 331-34 (noting that the "ingredients to apply the balance struck in Terry" are also present in consideration of allowing a protective sweep).

[71] Hopkins, 113 Wn. App. at 959 (citing Buie, 494 U.S. at 334-35).

[72] Id. at 959-60 (quoting Buie, 494 U.S. at 334).

"an imminent threat of substantial bodily injury" to S.B. *before* they kicked in the locked doors to gain entry to the room housing the illegal drugs. This is critical. If they did not, there was an insufficient showing of the existence of *all* of the Schultz factors to justify the warrantless search of the locked room. In sum, the warrantless entry of the locked room was without the "authority of law" that the state constitution requires.

For these reasons, the search of the locked room under this alternate argument was not justified. The evidence must be suppressed.

We reverse the judgment and sentence.

Cox, J.

WE CONCUR:

Becker, J.